No. 109,335

LUKE GANNON, by his next friends and guardians, *et al.*, *Appellees/Cross-appellants*, v. STATE OF KANSAS, *Appellant/Cross-appellee*.

(319 P.3d 1196)

1108

Opinion filed March 7, 2014.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, deputy attorney general, *M.J. Willoughby*, assistant attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant; *Arthur S. Chalmers*, of Hite, Fanning & Honeyman, LLP, of Wichita, argued the cause, and *Gaye B. Tibbets, Jerry D. Hawkins*, and *Rachel E. Lomas*, of the same firm, were with him on the briefs for appellant/cross-appellee.

*Alan L. Rupe*, of Kutak Rock, LLP, of Wichita, argued the cause, and *Jessica L. (Garner) Skladzien*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees/cross-appellants.

*Autumn L. Fox*, of The Law Office of Autumn L. Fox, P.A., of Abilene, and *Lawrence S. Lustberg*, of Gibbons, P.C., of Newark, New Jersey, were on the brief for *amicus curiae* Education Law Center.

*Dr. Walt Chappell*, of Educational Management Consultants, of Wichita, was on the brief for *amicus curiae* Educational Management Consultants.

*Robert E. Keeshan*, of Scott, Quinlan, Willard, Barnes & Keeshan L.L.C., of Topeka, was on the brief for *amicus curiae* Emporia Unified School District 253.

*Donna L. Whiteman* and *Lori M. Church*, of Kansas Association of School Boards, of Topeka, were on the brief for *amicus curiae* Kansas Association of School Boards.

*David M. Schauner*, of Kansas National Education Association, of Topeka, was on the brief for *amicus curiae* Kansas National Education Association.

*Per Curiam*: This is a "school finance" case that concerns Article 6 of the Kansas Constitution as well as various Kansas educational statutes. They include K.S.A. 72-6405 *et seq.* (School District Finance and Quality Performance Act or SDFQPA) and K.S.A. 72-8801 *et seq.* (capital outlay levy).

The defendant, the State of Kansas (appellant/cross-appellee), appeals from various holdings by a three-judge district court panel. The panel's holdings included a determination that the State violated Article 6 when the legislature underfunded K-12 public education between fiscal years 2009 and 2012, as well as a related determination that the legislature failed to consider the actual costs of providing a constitutionally required education before making its funding decisions. Its holdings also concluded that additional constitutional violations occurred because the legislature either withheld or reduced certain funding to which school districts were statutorily entitled. The panel enjoined the State from taking certain actions regarding school finance legislation.

The plaintiffs, U.S.D. No. 259, Wichita; U.S.D. No. 308, Hutchinson; U.S.D. No. 443, Dodge City; and U.S.D. No. 500, Kansas City, along with 31 individuals named in the pleadings as students and their guardians, cross-appeal from a number of the panel's holdings. Among other things, they contend the panel was wrong when it rejected education as a fundamental right under the Kansas Constitution, denied their substantive due process and equal protection claims, and refused to order the State to make "capital outlay state aid" payments for fiscal year 2010 to which many districts were entitled by statute. They also complain the panel set

"base state aid per pupil" at only $4,492 for fiscal year 2014 and denied their claims for attorney fees.

After the panel presided at a 16-day bench trial that produced a 21,000-page record, it issued a 250-page memorandum opinion and entry of judgment. Since then, approximately 800 pages of briefs have been filed by the parties and by five *amici*. The briefs contain numerous issues and arguments which we have consolidated.

At the outset, we hold the panel correctly ruled the individual plaintiffs do not have standing to bring any claims, and the plaintiff school districts do not have standing to bring their equal protection and due process claims. As for the districts' claims arising under Article 6 of the Kansas Constitution, we hold those claims are justiciable because they are not political questions. But we also hold the panel did not apply the correct constitutional standard in determining the State violated the Article 6 requirement of adequacy in public education. So we remand that issue to the panel to apply the standard articulated in this opinion and to make additional findings.

As for the capital outlay funding claims, we hold the panel correctly ruled that the State created unconstitutional, wealth-based disparities by withholding all capital outlay state aid payments to which certain school districts were otherwise entitled under K.S.A. 2012 Supp. 72-8814(c). We additionally hold the panel correctly refused to order payment of capital outlay state aid to which districts were otherwise entitled for fiscal year 2010. We further hold that the panel correctly ruled that the State created unconstitutional, wealth-based disparities by prorating the supplemental general state aid payments to which certain districts were entitled under K.S.A. 2012 Supp. 72-6434 for their local option budgets.

Finally, we hold the panel correctly ruled that the plaintiffs are not entitled to attorney fees.

Accordingly, we remand for the panel to enforce the affirmed rulings on equity and to fashion appropriate remedies. We also remand for the panel to apply the correct constitutional standard to plaintiffs' claims arising under Article 6 of the Kansas Consti-

tution. On remand, the panel shall proceed consistent with the further direction provided in this opinion.

## FACTS AND PROCEDURAL HISTORY

Because of the nature of this case, a short overview of funding for K-12 public education in Kansas is helpful in understanding the case's history, the arguments made by the parties to the panel, and the panel's holdings.

### SDFQPA Summary

The SDFQPA establishes the formula and mechanism through which most funds for K-12 public education are obtained by Kansas school districts. The formula provides a fixed amount of funding for each student through "base state aid per pupil," also known as BSAPP. A district's full-time equivalent enrollment is adjusted by adding various weightings based on the recognition that the needs of some students require more resources for their education than others. Once a school district's enrollment is adjusted per the weightings, that figure is multiplied by the BSAPP. The resulting product is the amount of state financial aid to which the school district is entitled.

Funding for the BSAPP is derived from two sources: local effort and state financial aid. The majority of school districts' local effort consists of property tax funds, as each district is statutorily required to impose a mill levy upon taxable tangible property in its territory. Because property values vary widely throughout the state, the amount of money each district can raise by the required mill levy also varies widely. So the State provides additional funds to less wealthy districts through "general state aid."

If a district's local effort funds equal its state financial aid entitlements, it receives no additional money from the State, *i.e.*, general state aid. And if a district's local effort funds exceed its state financial aid entitlement, the excess is remitted to the State. For those districts qualifying for general state aid, their amount is what remains after subtracting their local effort funds from their state financial aid entitlement.

Although local effort and state financial aid comprise most of the funds available for K-12 education, school districts can access additional funds in several ways, two of which are at issue in this case.

First, a local school board can impose an additional mill levy on property in its district to fund a local option budget (LOB) to augment the funds that are distributed through the BSAPP. After application of a statutory formula, in order to account for differences in property wealth among the districts, the less wealthy ones may also qualify for, and receive from the state, "supplemental general state aid."

Second, a local board can also impose an additional mill levy on property in its district to fund capital outlay expenses such as purchasing certain equipment. Although not part of the SDFQPA, the capital outlay mechanism, like the LOB's, also accounts for differences in districts' property wealth. After application of a statutory formula, the less wealthy districts may also qualify for, and receive from the state, "school district capital outlay state aid."

Montoy

The basic funding formula under the SDFQPA now in effect was essentially enacted in response to our holdings in a series of cases arising from litigation in *Montoy v. State*. These are: *Montoy v. State*, 275 Kan. 145, 62 P.3d 228 (2003) (*Montoy I*); *Montoy v. State*, 278 Kan. 769, 120 P.3d 306 (2005) (*Montoy II*); *Montoy v. State*, 279 Kan. 817, 112 P.3d 923 (2005) (*Montoy III*); and *Montoy v. State*, 282 Kan. 9, 138 P.3d 755 (2006) (*Montoy IV*).

The *Montoy* plaintiffs challenged certain components of the school finance formula, which the district court ultimately held unconstitutional because the formula did not comply with what the court determined was a duty under Kansas Constitution Article 6, Section 6(b) to "make suitable provision for finance of the educational interests of the state." This court affirmed in a brief opinion on January 3, 2005, designed to give the legislature guidance for modifying the formula during its 2005 session. *Montoy II*, 278 Kan. at 770-71.

The legislature timely revised the school finance formula during its 2005 session. But on June 3, 2005, we held its amendments fell short of compliance with our previous decision, so we retained jurisdiction to review further legislative action. *Montoy III*, 279 Kan. at 845-47.

During a special session called later that month, the legislature timely amended the formula and provided a funding increase totaling $289 million for the 2005-06 school year. After our review of the legislation, we issued an order on July 8 that held the State had complied with *Montoy III* " 'for interim purposes.' " *Montoy IV*, 282 Kan. at 15. We again retained jurisdiction to review additional action by the 2006 legislature.

During the legislature's 2006 regular session, it provided for an estimated total funding increase of $466.2 million over 3 years for K-12 education, making a total increase since January 3, 2005, of an estimated $755.6 million. See *Montoy IV*, 282 Kan. at 18. Included in its increases was a raise of the BSAPP from $4,257 to $4,316 for fiscal year 2007; to $4,374 for fiscal year 2008; and to $4,433 for fiscal year 2009. See *Montoy IV*, 282 Kan. at 17. The legislature again modified the funding formula. After our review of the legislation, we concluded the State had responded by substantially complying with our previous decisions—and we dismissed the *Montoy* litigation. See *Montoy IV*, 282 Kan. at 22-23, 26-27.

*Post* Montoy

In the wake of a national economic recession, the 2009 legislature began reducing education funding. The BSAPP appropriation was reduced from the 2006 legislature's statutorily specified amount of $4,433 to $4,400 in fiscal year 2009. And although the 2009 legislature had initially established BSAPP at $4,492 for fiscal year 2010 and beyond, the appropriation for fiscal year 2010 was reduced to $4,012. Additionally, the legislature began to withhold qualifying districts' funding entitlements to capital outlay aid and began to prorate, *i.e.*, reduce, the qualifying districts' funding entitlements to supplemental general state aid.

Midway through the 2010 fiscal year, in January 2010, the *Montoy* plaintiffs moved this court to reopen their appeal and remand the case to the district court with directions to hear evidence on two issues: (1) whether the current Kansas school finance funding scheme was constitutional and (2) whether funding cuts since the dismissal of the *Montoy* case were made in violation of Article 6, Section 6(b) of the Kansas Constitution, state law, or our mandates in *Montoy*. But this court denied the motion, which ultimately led to the filing of the current case by new plaintiffs.

Legislative reductions in K-12 education funding continued. By fiscal year 2012, the legislature essentially had reduced BSAPP to $3,780, while cuts to BSAPP in fiscal years 2009 to 2012 totaled more than $511 million. And the legislature continued to withhold capital outlay aid and to prorate supplemental general state aid to otherwise-entitled districts.

Gannon

The *Gannon* plaintiffs are four school districts and 31 individuals identified in the pleadings as students who attend school in those districts and their guardians. Each district lost funding beginning in fiscal year 2009 due to the reductions in the BSAPP, the withholding of capital outlay state aid, and the proration of supplemental general state aid.

On June 17, 2010, the plaintiffs submitted a notice of claims to the State as required by K.S.A. 2009 Supp. 72-64b02 and filed suit in Shawnee County District Court the following November. Two days later a three-judge panel was appointed pursuant to K.S.A. 2009 Supp. 72-64b03, and the panel eventually established venue in Shawnee County.

The plaintiffs raised eight counts, alleging a variety of constitutional and statutory violations related to school finance. Specifically, they alleged that the State violated the requirements of Article 6, Section 6(b) by failing to provide a suitable education to all Kansas students, consider the actual costs of education, and distribute education funds equitably. In support, the plaintiffs alleged that the State had (1) decreased overall education funding; (2) decreased the BSAPP; (3) required the use of LOB funds to pay for

basic educational expenses; (4) prorated supplemental general state aid; (5) withheld capital outlay state aid; and (6) underfunded special education.

The plaintiffs also alleged in a separate count that the State's failure to distribute capital outlay aid payments beginning in fiscal year 2010 created an inequitable, unconstitutional distribution of funds. For this count only, the panel later certified a class of "[a]ll Kansas school districts that were or will be certified by the Kansas Board of Education to receive capital outlay state aid funding pursuant to K.S.A. 72-8814, as amended, for fiscal years 2009-2010, 2010-2011, and 2011-2012." While 157 districts qualified as class members, 14 timely opted out before trial. The plaintiffs requested funds representing capital outlay aid payments not made for fiscal year 2010 and beyond.

The plaintiffs further claimed that the right to an education is a fundamental one under the Kansas Constitution and failure to provide suitable provision for finance under Article 6 was therefore a substantive due process violation under Section 18 of the Kansas Constitution Bill of Rights. They also alleged that the State denied them equal protection of the law under Sections 1 and 2 of the Kansas Bill of Rights and the Fourteenth Amendment of the United States Constitution. The plaintiffs also raised a number of miscellaneous claims they later abandoned on appeal.

The State denied all of plaintiffs' counts, generally asserting their claims were nonjusticiable. More specifically, the State challenged the plaintiffs' standing to bring their claims and the particular remedies sought. It also argued that the panel lacked jurisdiction to decide whether more or less school funding should be provided and what constitutes suitable provision for finance and equitable financing of public education. It contended such determinations would violate the doctrine of separation of powers and the legislature's decisions defining "suitable education" or "suitable provision for finance" were political questions beyond a court's reach.

As for the merits, the State argued that it had complied with its constitutional duty to make suitable provision for finance of the educational interests of the state. It contended that Kansas schools are receiving funds at record levels when all sources of state, local,

and federal funds are taken into account. It also highlighted the districts' holding of millions of dollars in unspent, available cash reserves. The State further argued no scientific evidence proved that additional funding for education would appreciably improve student performance or the quality of education provided. It also contended that students are generally performing well on assessments and that most schools have been able to meet accreditation requirements. Finally, it denied that education is a fundamental right under the Kansas Constitution.

At trial, the plaintiffs elicited testimony from various employees of the plaintiff districts; representatives from the Kansas Association of School Boards, Kansas Board of Regents, and Kansas State Department of Education; members of the legislature; and experts in the field of school finance. In response, the State called a series of school finance experts. In addition to this extensive testimony, 650 exhibits were received into evidence. Following trial, the panel issued its opinion, most of it devoted to the analysis of the plaintiffs' Article 6 claim.

The panel generally held that the State had violated Article 6, Section 6(b) by failing to provide suitable funding for education. More specifically, for plaintiffs' capital outlay claims the panel held that via K.S.A. 2012 Supp. 72-8814(c) the legislature's elimination of capital outlay state aid payments beginning in fiscal year 2010 created unconstitutional, wealth-based disparities among districts. And because the State failed to provide any such aid to districts with lower property wealth, the panel further held that K.S.A. 72-8801 *et seq.*—the act authorizing all districts to assess capital outlay mill levies—was unconstitutional and therefore inoperable.

As with the elimination of capital outlay state aid, the panel held that the legislature's proration of supplemental general state aid created unconstitutional, wealth-based disparities among districts. But it ruled the statutory scheme establishing such aid, K.S.A. 2012 Supp. 72-6434, was constitutional.

In rejecting plaintiffs' claim that education is a fundamental right under the Kansas Constitution, the panel further held that even if it accepted this view, insufficient evidence existed about the individual plaintiffs to sustain a substantive due process violation. Sim-

ilarly, the panel determined insufficient evidence existed about the individual plaintiffs regarding the equal protection claims. Given these rejections, it essentially ruled that the only plaintiffs with standing to bring their claims were the school districts, and only on the Article 6 claims.

In crafting remedies, the panel concluded that the "problems raised by the plaintiffs in our view have not been shown to flow from the [SDFQPA], but from a failure by the State to follow the Act's tenets and fully fund it as it directs." Thus, the panel entered a number of injunctions designed to enforce the SDFQPA and the capital outlay statute as enacted. It also directed and empowered the plaintiffs, their attorneys, or any other counsel designated by the panel to enforce its entry of judgment and order if violated by the State.

All parties appealed, and the State requested this court order mediation. After granting the motion, we ordered the parties to continue on the established briefing schedule. The mediation was conducted with mediators of the parties' choice on April 29 and 30, 2013, but was unsuccessful. Thus the briefs were filed in anticipation of oral argument and a decision by this court. We have jurisdiction under K.S.A. 60-2101(b).

We will provide more facts when required for our analysis.

## ANALYSIS

### JUSTICIABILITY

*The plaintiffs do not have standing to bring all the claims they assert.*

For the first time in Kansas school finance litigation since at least the district court level in *U.S.D. No. 229 v. State*, 256 Kan. 232, 885 P.2d 1170 (1994), the State raises the issue of nonjusticiability. If the State prevails on this threshold matter, we do not reach the merits of plaintiffs' claims and the case is dismissed. Plaintiffs respond that the issues are justiciable.

### Standard of review

Whether a claim is nonjusticiable is a question of law. See *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 903, 249 P.3d

434 (2011); *cf. Van Sickle v. Shanahan*, 212 Kan. 426, 439, 511 P.2d 223 (1973); see also *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 254-55, 990 A.2d 206 (2010) ("Because an issue regarding justiciability raises a question of law, our appellate review is plenary."); *Nebraska Coalition for Ed. Equity v. Heineman*, 273 Neb. 531, 540, 731 N.W.2d 164 (2007).

*Discussion*

Like the federal courts, Kansas courts do not render advisory opinions. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 888, 179 P.3d 366 (2008). The federal courts' prohibition against advisory opinions is imposed by Article III, Section 2 of the United States Constitution, which expressly limits the judicial power to "Cases" or "Controversies." 285 Kan. at 889.

But because Article 3 of the Kansas Constitution does not include any "case" or "controversy" language, our case-or-controversy requirement stems from the separation of powers doctrine embodied in the Kansas constitutional framework. 285 Kan. at 896. That doctrine recognizes that of the three departments or branches of government, "[g]enerally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws, and the judicial power is the power to interpret and apply the laws *in actual controversies*." (Emphasis added.) *Van Sickle*, 212 Kan. at 440. And Kansas, not federal, law determines the existence of a case or controversy, *i.e.*, justiciability. *Sebelius*, 285 Kan. at 893 (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617, 109 S. Ct. 2037, 104 L. Ed. 2d 696 [1989]). But this court is not prohibited from considering federal law when analyzing justiciability.

Under the Kansas case-or-controversy requirement, courts require that (a) parties have standing; (b) issues not be moot; (c) issues be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (d) issues not present a political question. See 285 Kan. at 891-92. The State relies upon two of these requirements to argue there is no justiciable case or con-

troversy: (1) plaintiffs lack standing and (2) plaintiffs' claims raise political questions.

Before we address these arguments, it is helpful to first set forth some of the relevant Kansas constitutional provisions dealing with education at grades K-12.

Article 6, Section 1 of the Kansas Constitution deals with the legislature and public schools. It provides:

"The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law."

Article 6, Section 2 deals with the legislature and the State Board of Education. It provides in relevant part:

"(a) The legislature shall provide for a state board of education which shall have general supervision of public schools, educational institutions and all the educational interests of the state, except educational functions delegated by law to the state board of regents. The state board of education shall perform such other duties as may be provided by law."

Article 6, Section 5 deals with the State Board of Education and local public schools. It provides:

"Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature."

Article 6, Section 6 deals with the legislature and, to a lesser extent, the State Board of Regents, which deals with higher education. It provides:

"(b) The legislature shall make suitable provision for finance of the educational interests of the state. No tuition shall be charged for attendance at any public school to pupils required by law to attend such school, except such fees or supplemental charges as may be authorized by law. The legislature may authorize the state board of regents to establish tuition, fees and charges at institutions under its supervision."

### Plaintiffs' standing

"Standing is 'a party's right to make a legal claim or seek judicial enforcement of a duty or right.' Black's Law Dictionary 1536 (9th ed. 2009)." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 324, 255 P.3d 1186 (2011).

The State generally argues that none of the plaintiffs has standing to bring claims under Article 6, equal protection, or due process. It specifically alleges that all plaintiffs lack standing because they failed to establish a cognizable injury. The State further argues the plaintiff school districts lack standing because they cannot assert third-party standing on behalf of their students. So the State urges dismissal, consistent with our past holding that "if a person does not have standing to challenge an action or to request a particular type of relief, then 'there is no justiciable case or controversy' and the suit must be dismissed. [Citation omitted.]" *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750, 189 P.3d 494 (2008).

The plaintiffs counter that the individual students and their guardians have standing to bring all claims because they suffered a cognizable injury. The plaintiffs further argue that the school districts have standing to bring the Article 6 and equal protection claims on behalf of the individual student plaintiffs under the doctrine of associational standing and to bring all the claims in their own right.

### The panel's holdings

The panel only briefly addressed standing in the context of the due process and equal protection claims. The panel held that the students, and by implication their guardians, lacked standing to assert these particular claims because the record failed to adequately identify those individuals and their link to those issues. It denied the individual plaintiffs' due process claim after holding that

"there is inadequate evidence before this Court about the individually named Plaintiffs other than their names and schools of attendance (Plaintiffs' Amended Petition and ¶¶ 1-31) upon which this Court could assign one of those named Plaintiffs to a recognized statute or class that might . . . invoke such a due process violation."

And the panel similarly denied the individual plaintiffs' equal protection claim, holding it "falters from lack of any identifying characteristics of, or circumstances attributable to, the named student Plaintiffs."

As for the four plaintiff school districts, the panel also held that they lacked standing to assert an equal protection claim, ruling that the school districts "failed to identify a deliberate, intended disparate consequence from the school finance act or by those acting in furtherance of it." In the alternative, citing *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 507-08, 110 P.3d 438 (2005), it held the districts had no standing because "they have not demonstrated that they can raise an equal protection claim on behalf of their students." *Cross* reaffirmed the general rule that a litigant may not challenge the constitutionality of a statute as it hypothetically applies to another unless it first establishes that the statute negatively affects its own rights. 279 Kan. at 507-08. So the panel appears to have held that the districts lacked standing to raise an equal protection challenge on behalf of their students because they failed to establish that their own rights had been violated.

As for the plaintiff school districts' due process claim, the panel's analysis is less clear. It denied the districts' substantive due process claim after holding, in part, that "substantive due process is an individual and personal right" and school districts "do not hold a status as individuals."

*Standard of review and principles of law for standing challenges*

While standing is a requirement for a case-or-controversy, *i.e.*, justiciability, it is also a component of subject matter jurisdiction that may be raised at any time. *Stechschulte v. Jennings*, 297 Kan. 2, 29, 298 P.3d 1083 (2013). The question of standing is one of law over which this court's scope of review is unlimited. *Cochran*, 291 Kan. at 903.

Generally, to have standing, *i.e.*, to have a right to make a legal claim or seek enforcement of a duty or right, a litigant must have a "sufficient stake in the outcome of an otherwise justiciable controversy in order to obtain judicial resolution of that controversy." *Moorhouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172

(1996). Under the traditional test for standing in Kansas, " 'a person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct.' " *Cochran*, 291 Kan. at 908-09 (quoting *Bremby*, 286 Kan. at 761). We have also referred to the cognizable injury as an " 'injury in fact.' " *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 406, 197 P.3d 370 (2008). And this court occasionally cites the federal rule's standing elements that "a party must present an injury that is concrete, particularized, and actual or imminent; the injury must be fairly traceable to the opposing party's challenged action; and the injury must be redressable by a favorable ruling." *Ternes v. Galichia*, 297 Kan. 918, 921, 305 P.3d 617 (2013).

As to standing's first element of establishing a cognizable injury, more particularly we have held that "a party must establish a personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct." *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 (2013). The injury must be particularized, *i.e.*, it must affect the plaintiff in a " 'personal and individual way.' " 298 Kan. at 35 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1, 112 S. Ct. 2130, 119 L. Ed. 2d 351 [1992]). It cannot be a " 'generalized grievance' " and must be more than "merely a general interest common to all members of the public.' [Citations omitted.]" 504 U.S. at 575.

The burden to establish these elements of standing rests with the party asserting it. See, *e.g.*, *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 793, 107 P.3d 1219 (2005) (for third-party standing); *DaimlerChrylser Corp. v. Cuno*, 547 U.S. 332, 342, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006) (for federal jurisdiction).

And the nature of that burden depends on the stage of the proceedings because the elements of standing are not merely pleading requirements. Each element must be proved in the same way as any other matter and with the degree of evidence required at the successive stages of the litigation. *Lujan*, 504 U.S. at 561. So because the panel apparently waited until after the trial to dismiss some claims based on lack of standing, and the State has waited

until the appeal to raise some standing arguments, the facts alleged to prove standing must be " 'supported adequately by the evidence adduced at trial.' " *Lujan*, 504 U.S. at 561. In these civil proceedings the preponderance of the evidence standard applies. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). Under this standard the plaintiffs' evidence must show that "a fact is more probably true than not true." 286 Kan. at 691.

*The individual plaintiffs do not have standing to bring any claims.*

Despite the panel's finding that the only evidence regarding the individually named plaintiffs was their names and schools of attendance, the State contends the plaintiffs have failed to meet even that burden to present evidence identifying at least one of the individual plaintiffs by name and establishing that he or she attended public school in Kansas. See *Lujan*, 504 U.S. at 561 (facts necessary to establish standing "depend[] considerably upon whether the plaintiff himself is an object of the action"). As explained below, we agree.

In their cross-appellant's brief, the plaintiffs assert that they "consist of students, parents of students, and school districts that represent all Kansas school children." In support, they cite an excerpt from *Caldwell v. State*, No. 50,616 (Johnson County D. Ct., August 30, 1972), their amended petition, and testimony by two trial witnesses.

The *Caldwell* decision is of no support. There, the district court described the plaintiffs as "Michele Caldwell and Michael Caldwell, minors by and through James Caldwell, their father and next friend as representatives of a class composed of all public school pupils in Kansas." *Caldwell*, No. 50,616. We do not have the *Caldwell* record before us to confirm that the district court there certified a plaintiff class. But it is clear from the record in this case that the panel certified a class action only for the school districts and on only the capital outlay issue. So we must reject plaintiffs' claim that the individual students in this case represent a class composed of all public school children.

Turning to plaintiffs' amended petition, they alleged without any substantive argument that the individual plaintiffs and plaintiff school districts have standing to bring all claims. In identically formatted paragraphs numbered 1-31, the amended petition identifies the individual plaintiffs, their next friends and guardians, and the school districts they purport to attend. For example:

"1. Plaintiff Luke Gannon, by next friends and guardians, Jeff and Meredith Gannon, is a student attending public school at U.S.D. 259 and is a citizen and resident of the State of Kansas."

The State's amended answer declared that it lacked sufficient knowledge or information to admit or deny the allegations. And in the pretrial order, the State continued to assert that the plaintiffs lacked standing as a general defense to all claims and that it did not stipulate to the factual basis that would support the individual students' standing.

At trial, the plaintiffs entered their amended petition into evidence as an exhibit by stipulation. But as their counsel admitted at oral arguments before this court, and as the trial transcript bears out, the parties only stipulated that both sides' exhibits were admissible—and not that the exhibits were "accurate and true." Consistent with this limited stipulation, plaintiffs' counsel had expressed on the record his intention to the panel "to challenge every one" of the exhibits entered by the State.

When parties stipulate only to the admissibility of evidence, the stipulation is enforceable only to the extent of that agreed-upon condition. See *State v. Gordon*, 219 Kan. 643, 651, 549 P.2d 886 (1976) (recognizing limited stipulation to identification and chain of custody of test results did not foreclose objection on other grounds, *i.e.*, impermissible search). Because the parties here did not stipulate to their exhibits' accuracy or truth, the amended petition's identification of the individually named plaintiffs by their names and schools of attendance did not meet the plaintiffs' burden of proof.

Accordingly, the only admitted evidence regarding the individual plaintiffs must be gleaned from trial testimony. No individual plaintiffs testified. And plaintiffs' counsel essentially acknowledged at

oral arguments before this court that no evidence was presented regarding the student plaintiffs from the Wichita, Hutchinson, and Dodge City school districts other than their names. So plaintiffs refer us to the testimony of two witnesses from the Kansas City, Kansas, school district.

At trial, Cynthia Lane, the Superintendent of the Kansas City, Kansas, school district, testified as follows:

"Q. [Plaintiffs' counsel:] With regard to the Plaintiff kids in this district, they are kids in your district?

"A. [Lane:] They are.

"Q. [counsel:] And they're representative of those—

"A. [Lane:] Absolutely.

"Q. [counsel:] —issues we've talked about today?

"A. [Lane:] They are."

Lane did not identify the plaintiffs in her school district by name.

The testimony from the second witness cited by the plaintiffs is even less informative. Mary Stewart, principal at Wyandotte High School in the Kansas City, Kansas, district, was called to testify, and the State objected. Plaintiffs' counsel proffered her testimony, representing Stewart would testify in part that one of the individual plaintiffs is enrolled in her school. She was then permitted to testify. But when Stewart was asked whether at least one plaintiff was in her school, she responded "that was the first I'd heard about it when you said that." Counsel replied: "Well, you do [have at least one plaintiff in your school]." At our oral arguments, counsel admitted his statement is not evidence. See *In re K.E.*, 294 Kan. 17, 24-25, 272 P.3d 28 (2012); PIK Civ. 4th 102.04 ("Statements and arguments of counsel are not evidence.").

This testimony from these two school administrators is insufficient to establish the elements of standing by a preponderance of the evidence for any of the individually named plaintiffs. See *Lujan*, 504 U.S. at 563 (" '[T]he "injury in fact" test requires . . . that the party seeking review be himself among the injured.' [Citation omitted.]") So we must dismiss them and thus all their claims. *Bremby*, 286 Kan. at 750 ("[I]f a person does not have standing to challenge an action or to request a particular type of relief, then 'there is no justiciable case or controversy' and the suit must be dismissed.").

Because the individual plaintiffs do not have standing, we need not address the plaintiffs' argument that the districts have standing to bring their claims on behalf of the individual plaintiffs under the doctrine of associational standing. See *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 387, 996 P.2d 821 (2000) (citing *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 [1977]) (An association has standing to sue on behalf of its members only when, among other things, "the members have standing to sue individually."). Accordingly, for this case to avoid dismissal and proceed to the merits, the plaintiff school districts must establish standing in their own right.

*The school district plaintiffs have standing to bring some of their claims.*

As recited above, to establish standing at this stage the plaintiff school districts must prove by a preponderance of the evidence that they suffered a cognizable injury and a causal connection exists between the injury and the challenged conduct. *Cochran*, 291 Kan. at 908-09; *Stovall*, 278 Kan. at 793. As detailed below, we conclude that the plaintiff districts have met their burden of proof concerning their Article 6 claims but have failed to do so regarding their equal protection and due process claims.

*School district standing for Article 6 claims*

The State argues that the plaintiff school districts lack standing because they did not suffer a cognizable injury under Article 6, Section 6 of the Kansas Constitution. But the plaintiffs contend in their response brief and maintained at oral arguments before this court that the State's violation of Section 6(b) harmed the districts by significantly undermining their ability to perform their constitutional duties required under Section 5.

Article 6 makes assignments concerning K-12 public education to several entities, including the legislature and the local school boards, *i.e.*, the districts. See *State, ex rel., v. Board of Education*, 212 Kan. 482, 484-85, 511 P.2d 705 (1973) (acknowledging that, since the 1966 constitutional amendments, Article 6, Section 1 now imposed "[a] greater sense of obligation on the part of the state to

participate in the support of public schools and in the general field of public education" and explaining constitutional interplay among certain educational entities, *e.g.*, the State Board of Education and locally elected school boards). These assignments include a Section 1 duty on the legislature to establish and maintain public schools in the state (*U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 463-64, 845 P.2d 676 [1993]) and a Section 6(b) duty to finance educational interests of the state, which includes K-12 public education. See *U.S.D. No. 229 v. State*, 256 Kan. 232, 251-53, 885 P.2d 1170 (1994).

Article 6, Section 5 makes assignment to the local school boards to " 'maintain, develop, and operate the local public school system' " under the general supervision of the State Board of Education. *U.S.D. No. 229*, 256 Kan. at 253. Consequently, the plaintiffs argue that under Section 5, the local school boards make the decisions on how educational funds will be spent and on many aspects of primary and secondary public education, subject to the state board's general supervision.

We have said " '[t]he respective duties and obligations vested in the legislature and the local school boards by the Kansas Constitution must be read together and harmonized so both entities may carry out their respective obligations.' " *U.S.D. No. 229*, 256 Kan. at 253 (quoting *McMillen*, 252 Kan. at 464). And when these constitutional provisions are in conflict, legislative action encroaches on the school board's authority when " 'it unduly interferes with or hamstrings the local school board in performing its constitutional duty to maintain, develop, and operate the local public school system.' " 256 Kan. at 253 (quoting *McMillen*, 252 Kan. at 464).

The State argues that *U.S.D. No. 229* essentially disposes of the plaintiffs' argument for Section 5 standing. At issue in *U.S.D. No. 229* was the earliest enactment of the School District Finance and Quality Performance Act (SDFQPA), K.S.A. 72-6405 *et seq.*, a later version of which is involved in the instant case. There some of the plaintiffs argued that the legislature's imposition of a statewide mill levy for education and its restrictions on the amount and use of the local option budget undermined the local boards' authority under Section 5.

This court disagreed, holding that fiscal control is not an inherent part of the local boards' authority under Section 5. It concluded that because Article 6, Section 6(b) specifically places the authority and responsibility to finance the public school system with the legislature, not the individual districts, then a district has the power to assess taxes locally only to the extent that authority is clearly granted by the legislature. And because the legislature had not delegated its duty to " 'make suitable provision for finance of the educational interests of the state' " to the local school boards, the plaintiffs could not prevail on their claim. 256 Kan. at 251.

We disagree with the State that *U.S.D. No. 229* forecloses the districts' argument—that the legislature's finance decisions violate the school boards' Section 5 duties to " 'maintain, develop, and operate the local public school system' " (quoting *McMillen*, 252 Kan. at 464). More specifically, *U.S.D. No. 229* is not a prohibition against districts claiming that the legislature's failure to comply with its own constitutional duties unduly interferes with their duties under Section 5. Rather, *U.S.D. No. 229* essentially stands for the proposition that Sections 5 and 6 did not "require the State to provide direct financial aid or the means to raise tax monies sufficient to cover *what each school district determines* is 'suitable financing' for the particular district's needs." (Emphasis added.) 256 Kan. at 252.

Here, the districts make a much different argument. In support of their claim that the State's violation of Article 6, Section 6(b) has prevented them from meeting their own duties under Section 5, they contend they suffered a cognizable injury in the form of student underachievement, reduction of necessary programs and services, and overall decreased school and district performance.

As for the plaintiff districts' claim of manifest injury, the panel made several findings of fact that are supported by substantial competent evidence. It found that each of the plaintiff districts had experienced substantial reduction in funds due to the legislative cuts. Citing test scores for the students and certain schools in the district, as well as graduation rates, each superintendent essentially testified his or her district did not have the resources to provide all of its students with what they described as "a suitable educa-

tion." Testimony was also received establishing that, because of reduced funding levels, the plaintiffs have had to significantly reduce certificated staff and reduce or freeze teacher salaries.

The plaintiffs also presented testimony establishing that certain strategies and methods that work for improving student achievement have been cut back or eliminated due to decreased funds. These strategies include extracurricular activities and smaller class sizes. And further strategies that have been reduced or eliminated include extended learning opportunities such as all-day kindergarten, before and after school programs, longer school days, and summer school.

The panel also made several findings of fact regarding the plaintiff districts' failure to meet some of the State's accreditation requirements. Under the Quality Performance Accreditation system, a school is assigned its accreditation status annually based in part on its performance on assessment tests. Before July 2012, state assessment criteria were partially based on the adequate yearly progress (AYP) path the State had adopted for 100% of its students to meet or exceed the proficient level on annual math and reading assessments. In fiscal year 2011, 15.7% of the State's schools and 26.6% of its districts failed to make AYP.

The plaintiff districts are among those that have struggled to meet AYP targets. In fiscal year 2011, Dodge City and Hutchinson were classified as "on improvement," which means each failed to meet AYP for the 2 prior years. And Kansas City and Wichita were "on corrective action," which means each had been "on improvement" for at least the previous 2 years. These findings are all supported by substantial competent evidence in the record.

We conclude that the plaintiff districts have met their burden of proof by a preponderance of the evidence to demonstrate for standing purposes that they suffered a cognizable injury. See *Cochran*, 291 Kan. at 908-09. So we next turn to whether that injury was causally connected to the challenged conduct. See 291 Kan. at 908-09.

The federal courts define the causal connection requirement as meaning the injury must be " 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the

independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560. Plaintiffs argue their injury was caused because the State, *i.e.*, the legislature, greatly reduced funding for education. This injury is "fairly traceable" to the State and is not the result of a third party's actions. So we conclude the plaintiff districts have met their burden of proof by a preponderance of the evidence to establish standing's causation requirement.

Accordingly, although the parties disagree about an evidentiary link between reduced funding and educational outcomes, we conclude the plaintiff districts have standing to bring the Article 6 claims in their own right.

### *School district standing for plaintiffs' equal protection claim*

The panel held the plaintiff school districts lacked standing to bring the equal protection claim. The districts argue only that they have associational standing to sue on behalf of the individual student and parent plaintiffs. But because we have already concluded that the individual plaintiffs do not have standing, the district plaintiffs have no standing to bring an equal protection claim on their behalf. See *NEA-Coffeyville*, 268 Kan. at 387. Therefore, we must dismiss their equal protection claim. *Bremby*, 286 Kan. at 750.

### *School district standing for plaintiffs' due process claim*

The panel's analysis is not as clear regarding the plaintiff districts' standing on the due process claim. It held substantive due process is an individual and personal right, and the districts do not hold status as individuals. See *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). We conclude from this holding the panel determined the districts therefore had no standing to bring the due process claims in their own right.

Plaintiffs do not assert any evidentiary grounds to establish standing for this claim. Rather, they appear to argue they have standing because they are "persons" under Section 18 of the Bill of Rights of the Kansas Constitution. Section 18 provides: "All *persons*, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." (Emphasis added.) Specifically, the plaintiff districts

contend they can raise a substantive due process claim because federal courts have held that local governments like themselves may constitute a "person" under 42 U.S.C. § 1983 (2006).

We agree with the State's basic response. 42 U.S.C. § 1983, and its interpretive caselaw—primarily *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)—concern an individual's right to bring a cause of action for violation of his or her constitutional rights against a defendant governmental entity that qualifies as a "person" under the statute. The original version of the statute reviewed by the Court provided in relevant part: " '[A]*ny person* who, under color of any law . . . shall subject, or cause to be subjected, any person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured . . . .' " (Emphasis added.) 436 U.S. at 691-92.

After examining the legislative history, the Supreme Court concluded Congress intended "municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. at 690-91. Accordingly, it held "[l]ocal governing bodies . . . *can be sued* directly under § 1983." (Emphasis added.) 436 U.S. at 690-91. So *Monell* only held that local governments qualify as "persons" for purposes of serving as defendants in suits by plaintiffs alleging violations of federal rights.

The federal circuit courts of appeals are split as to whether a governmental entity necessarily may qualify as a "person" to be a plaintiff in a § 1983 action to seek a remedy for deprivation of the entity's constitutional "rights, privileges, or immunities." The Seventh Circuit, for example, has held that a municipality may not bring a claim under § 1983. *Rockford Bd. of Educ. v. Illinois Bd. of Educ.*, 150 F.3d 686, 688 (7th Cir. 1998).

By contrast, the Tenth Circuit does allow local government entities to bring claims in § 1983 actions. In *Rural Water Dist. No. 1 v. City of Wilson, Kansas*, 243 F.3d 1263 (10th Cir. 2001), the court reviewed an amended version of § 1983, which stated in relevant part: "*Every person* who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or *other person* . . ." (Emphasis added.) 42 U.S.C. § 1983

(2000). It concluded: " '[I]n light of *Monell*, it would be a strained analysis to hold, as a matter of statutory construction, that a municipal corporation was a "person" within one clause of section 1983, but not a "person" within another clause of that same statute.' [Citation omitted.]" *Rural Water Dist. No. 1*, 243 F.3d at 1274.

But *Rural Water Dist. No. 1* does not help the districts acquire standing to bring their substantive due process claims. The court held that although " 'a political subdivision [may] sue its parent state when the suit alleges a violation by the state of some controlling federal law[,]' " nevertheless " 'a municipality may not bring a constitutional challenge against its creating state *when the constitutional provision that supplies the basis for the complaint was written to protect individual rights.*' " (Emphasis added.) 243 F.3d at 1273-74 (quoting *Branson School Dist. RE-82 v. Romer*, 161 F.3d 619, 628, 630 [10th Cir. 1998]).

This conclusion stems from United States Supreme Court precedent holding local governments do not have standing to invoke the protection of the Fourteenth Amendment to the United States Constitution against the actions of state government. See *Williams v. Mayor*, 289 U.S. 36, 40, 53 S. Ct. 431, 77 L. Ed. 1015 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator. [Citations omitted.]"); *Risty v. Chicago, R.I. & Pac. Ry. Co.*, 270 U.S. 378, 390, 46 S. Ct. 236, 70 L. Ed. 641 (1926) ("The power of the State and its agencies over municipal corporations within its territory is not restrained by the provisions of the Fourteenth Amendment."); see also *City of Moore v. Atchison, Topeka, & Santa Fe Ry.*, 699 F.2d 507, 511-12 (10th Cir. 1983) ("[P]olitical subdivisions of a state lack standing to challenge the validity of a state statute on Fourteenth Amendment grounds."); *Avon Lake City School Dist. v. Limbach*, 35 Ohio St. 3d 118, 122, 518 N.E.2d 1190 (1988) ("A political subdivision, such as a school district, receives no protection from the Equal Protection or Due Process Clauses vis-a-vis its creating state.").

The Louisiana Supreme Court provides excellent guidance for resolving our plaintiff school districts' argument of standing to bring their due process claim. Similar to Kansas Bill of Rights Section 18 ("All *persons*, for injuries suffered in person, reputation or property, shall have remedy by due course of law . . ."), Article I, Section 2 of Louisiana's constitution states: "No *person* shall be deprived of life, liberty, or property, except by due process of law." (Emphasis added.) The court held that this constitutional provision "protects only the rights of 'persons' and does not protect government entities against unjust government action." *Assessors' Retirement Fund v. New Orleans*, 849 So. 2d 1227, 1229 (La. 2003).

Previously this court has not specifically addressed local government standing to bring claims under Section 18 of the Kansas Constitution Bill of Rights. But we have traditionally construed the protections of Section 18 to be the same as those guaranteed by the Fourteenth Amendment to the United States Constitution. See *Murphy v. Nelson*, 260 Kan. 589, 597, 921 P.2d 1225 (1996). And we do so here. So we must also dismiss the plaintiff districts' due process claim for lack of standing. *Bremby*, 286 Kan. at 750.

In conclusion, the plaintiff districts have established that they only have standing to bring the Article 6 claims in their own right. But before we reach the merits, we must next determine whether these particular claims are nonjusticiable political questions under the Kansas Constitution. If so, we must then dismiss. *Cf. Van Sickle v. Shanahan*, 212 Kan. 426, 439, 511 P.2d 223 (1973) ("[W]e find none of the traditional elements of a 'political' controversy which would indicate want of jurisdiction to consider the merits of the question raised by the appellants.").

*The school districts' claims under Article 6 are justiciable because they do not present political questions.*

The State specifically argues "whether the legislature has made 'suitable provision for finance of the educational interests of the state' is a nonjusticiable question" because it is "political" in character—where plaintiffs do not claim the school finance formula itself violates Article 6 of the Kansas Constitution but that the State has failed to adequately fund the system. As the State points out,

a political question is required to be left unanswered by the judiciary, *i.e.*, is "nonjusticiable." See *Van Sickle*, 212 Kan. at 438. It further points out that the supreme courts from some of our neighboring states have declared challenges to state education funding systems to be nonjusticiable. See, *e.g.*, *Nebraska Coalition for Ed. Equity v. Heineman*, 273 Neb. 531, 557, 731 N.W.2d 164 (2007).

The plaintiffs generally respond that " 'the vast majority of jurisdictions "overwhelmingly" have concluded that claims that their legislatures have not fulfilled their constitutional responsibilities under their education clauses are justiciable.' " They quote *Davis v. State*, 804 N.W.2d 618, 641 n.34 (S.D. 2011) (quoting *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 267 n.24, 990 A.2d 206 [2010] [collecting cases]).

The particular issue of nonjusticiability because of a political question in a school finance case is one of first impression for this court—although we have previously adjudicated school finance cases without anyone questioning our authority to do so. So as we address the State's argument, it must be viewed against the historical backdrop of this court's school finance decisions where we obviously have done more than those states' supreme courts which held their school finance issues were nonjusticiable political questions. For example, in *Knowles v. State Board of Education*, 219 Kan. 271, 279-80, 547 P.2d 699 (1976), this court held that because it could not determine the constitutional issues raised in light of the 1975 amendments to the 1973 Kansas School District Equalization Act, it remanded the case to district court for reconsideration in light of any intervening changes in the Act. Upon remand, the district court held the Act was constitutional. *U.S.D. No. 229*, 256 Kan. at 243.

This history also includes: *U.S.D. No. 229*, 256 Kan. at 259 (holding that the School District Finance and Quality Performance Act "does not contravene the provisions of § 6(b) of Article 6 that the legislature shall make suitable provision for the financing of public education"); *Montoy v. State*, 275 Kan. 145, 154-55, 62 P.3d 228 (2003) (*Montoy I*) (reversing dismissal of plaintiffs' petition and remanding to district court "to determine . . . whether the school financing provisions complained of are now constitutional"); *Mon-*

*toy v. State*, 278 Kan. 769, 775, 120 P.3d 306 (2005) (*Montoy II*) (holding that legislature had "failed to 'make suitable provisions for finance' of the public school system as required by Art. 6, § 6 of the Kansas Constitution"); *Montoy v. State*, 279 Kan. 817, 840, 112 P.3d 923 (2005) (*Montoy III*) (holding that a continuing lack of constitutionally adequate funding "mean[s] the school financing formula . . . still falls short of the standard set by Article 6, § 6 of the Kansas Constitution"); *Montoy v. State*, 282 Kan. 9, 18-19, 25, 138 P.3d 755 (2006) (*Montoy IV*) (finding substantial legislative compliance with court's prior remedial orders regarding funding of the school finance formula and holding that a constitutional challenge to the amendments "must wait for another day").

Despite this history of adjudicating plaintiffs' claims that the legislature has not fulfilled its constitutional responsibilities under Article 6, we will directly address the State's political question argument. See *Neeley v. West Orange-Cove*, 176 S.W.3d 746, 777-78 (Tex. 2005) (While Texas Supreme Court had rejected State's nonjusticiability argument in 1989, it addressed again because State particularly argued [1] history of school finance litigation over past 2 decades required reconsideration and [2] issues of adequacy, suitability, and efficiency under Texas Constitution were all nonjusticiable political questions when applying two tests from *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 [1962].).

Because the panel decided the Article 6 issue on the merits, it necessarily rejected the State's political question argument. As explained in more detail below, we reject it as well.

### Standard of review

When addressing whether a claim is nonjusticiable specifically because it may be a political question is an issue of law. See *Van Sickle*, 212 Kan. at 439 (characterizing determination of the political question issue as jurisdictional—a question of law). And jurisdiction is a question of law, which we review de novo. *Frazier v. Goudschaal*, 296 Kan. 730, 743-44, 295 P.3d 542 (2013).

Most states agree. See, *e.g.*, *Rell*, 295 Conn. at 254-55 (" '[B]ecause an issue regarding justiciability raises a question of law, our appellate review is plenary.' "); *Heineman*, 273 Neb. at 540

("[W]hether a claim presents a nonjusticiable political question is a question of law.").

*Discussion*

The United States Supreme Court has held: "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. at 210. In other words, it is an acknowledgment of "the relationship between the judiciary and the other branches or departments of government." *Leek v. Theis*, 217 Kan. 784, 804, 813, 539 P.2d 304 (1975). As we acknowledged in *Van Sickle*:

" 'The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.' " 212 Kan. at 445 (quoting Federalist No. 47).

As a result, "[t]he governments, both state and federal, are divided into three departments, each of which is given the powers and functions appropriate to it. Thus a dangerous concentration of power is avoided, and also the respective powers are assigned to the department best fitted to exercise them." 212 Kan. at 439-40. As a consequence of the separation of powers among the legislative, executive, and judicial branches, "[q]uestions in their nature political . . . can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L. Ed. 60 (1803).

The United States Supreme Court "identified and set forth six characteristics or elements one or more of which must exist to give rise to a political question." *Leek*, 217 Kan. at 813 (discussing *Baker v. Carr*, 369 U.S. at 217). Under *Baker v. Carr*, a case should not be dismissed as nonjusticiable on the ground of a political question's presence unless at least one of the elements or factors "is inextricable from the case at bar." 369 U.S. at 217; see *Rell*, 295 Conn. at 255-56.

As italicized below, the State now relies upon four of the six *Baker v. Carr* factors, any one of which it argues would allow us to conclude its issue is a nonjusticiable political question.

"Prominent on the surface of any case held to involve a political question is found a [1] *textually demonstrable constitutional commitment of the issue to a coordinate*

*political department* [legislature]; [2] *or a lack of judicially discoverable and manageable standards for resolving it*; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] *or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government*; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] *or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.*" (Emphasis added.) 369 U.S. at 217.

The parties correctly point out that this court has previously applied the *Baker v. Carr* factors, sometimes concluding an issue was a nonjusticiable political question (*Leek*, 217 Kan. at 813-16) and sometimes concluding it was not (*Van Sickle*, 212 Kan. at 438-39). And as mentioned, no such case involved public education in Kansas.

Before fully addressing these factors, it is helpful to restate some of the relevant Kansas constitutional provisions specifically dealing with the legislature and education at grades K-12.

Article 6, Section 1 provides that

"[t]he legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law."

Article 6, Section 6(b) provides that

"[t]he legislature shall make suitable provision for finance of the educational interests of the state. No tuition shall be charged for attendance at any public school to pupils required by law to attend such school, except such fees or supplemental charges as may be authorized by law. The legislature may authorize the state board of regents to establish tuition, fees and charges at institutions under its supervision."

We have recognized that Article 6 contains at least two components: equity and adequacy. See *Montoy II*, 278 Kan. at 775. For example, there we held that "[t]he equity with which the funds are distributed" is a critical factor "for the legislature to consider in achieving a suitable formula for financing education." 278 Kan. at 775. We also emphasized that "increased funding may not in and of itself make the [education] financing formula constitutionally suitable." 278 Kan. at 775; see also *U.S.D. No. 229 v. State,*

256 Kan. 232, 256-57, 885 P.2d 1170 (1994) (quoting with approval the district court) (" 'The standard most comparable to the Kansas constitutional requirement of "suitable" funding is a requirement of adequacy found in several state constitutions.' "). Here, the plaintiffs make both adequacy and equity-based challenges.

*Factor 1: There is no textually demonstrable constitutional commitment of the issue to a coordinate political department.*

Although many state supreme courts have addressed the political question nonjusticiability issue in reviewing their constitutions' education clauses—and as plaintiffs point out, a clear majority of them have ruled in favor of justiciability—we find considerable guidance from the Supreme Court of Texas. In *Neeley*, the state defendants argued that the first *Baker v. Carr* test was satisfied by the language of Article VII, Section 1 of the Texas Constitution which they contended expressly made the establishment, support, and maintenance of free public schools " 'the duty of the legislature.' " 176 S.W.3d at 778. That article provided:

" 'A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, *it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools.*' " (Emphasis added.) 176 S.W.3d at 752.

According to the state defendants, this language meant that the issues of adequacy, suitability, and efficiency under the Texas Constitution were all nonjusticiable political questions. 176 S.W.3d at 777-78.

In rejecting the State's argument, the Texas Supreme Court recalled that in the first appeal of the case, it had explained " '[b]y assigning to the Legislature a duty, [article VII, section 1] both empowers and obligates.' " 176 S.W.3d at 778 (quoting *West Orange-Cove Consol. I.S.D. v. Alanis*, 107 S.W.3d 558, 563 [Tex. 2003] [*West Orange-Cove I*]). The *Neeley* court then ruled the Texas Legislature's constitutional authority in the area was not absolute:

"The Constitution commits to the Legislature, the most democratic branch of the government, the authority to determine the broad range of policy issues involved in providing for public education. But the Constitution nowhere suggests that the

Legislature is to be the final authority on whether it has discharged its constitutional obligation. *If the framers had intended the Legislature's discretion to be absolute, they need not have mandated that the public education system be efficient and suitable; they could instead have provided only that the Legislature provide whatever public education it deemed appropriate.* The constitutional commitment of public education issues to the Legislature is primary but not absolute." (Emphasis added.) 176 S.W.3d at 778.

As the Texas Supreme Court noted in *Neeley*, 16 years earlier that court had actually rejected the State's nonjusticiability argument, reversing its Court of Appeals, in *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391, 393-94 (Tex. 1989) (*Edgewood I*). As its general rationale, the *Edgewood I* court had ruled that based upon the constitutional language, the legislature's duty in the educational area "is not committed unconditionally to the legislature's discretion, but instead is accompanied by standards." 777 S.W.2d at 394. The *Edgewood I* court acknowledged that the constitution's "suitable" provision for an "efficient" system for the "essential" purpose of a "general diffusion of knowledge" were "admittedly not precise terms." 777 S.W.2d at 394. But they nevertheless "do provide a standard by which this court must, when called upon to do so, measure the constitutionality of the legislature's actions." 777 S.W.2d at 394.

And as the *Neeley* court earlier held in its 2005 opinion, " '[i]f the system is not "efficient" or not "suitable," the legislature has not discharged its constitutional duty and it is *our* duty to say so.' " 176 S.W.3d at 777 (quoting *Edgewood I*, 777 S.W.2d at 394). The Texas Supreme Court's ruling was clear: " 'The final authority to determine adherence to the Constitution resides with the Judiciary.' " 176 S.W.3d at 777 (quoting *West Orange-Cove I*, 107 S.W.3d at 563).

Like the Texas Supreme Court's relationship to its state constitution, the Kansas Supreme Court is the final authority to determine adherence to the Kansas Constitution. See *Harris v. Shanahan*, 192 Kan. 183, 206-07, 387 P.2d 771 (1963) ("In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas.").

And like the Texas Supreme Court, we obviously look to the language of our own constitution for the possible existence of *Baker*

*v. Carr*'s "textually demonstrable constitutional commitment of the issue to a coordinate political department." 369 U.S. at 217. As with the Texas legislature, ours has received certain assignments. In Texas, "it shall be the duty of the legislature of the state to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. In Kansas, two sections of Article 6 together supply similar language. Section 1 states: "The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities . . . ." And Section 6(b) states in relevant part: "The legislature shall make suitable provision for finance of the educational interests of the state."

The word "shall" in both Sections 1 and 6(b) of Article 6 reflects a constitutional duty. See Levy, *Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation*, 54 Kan. L. Rev. 1021, 1051-52 (2006) ("[T]he text of article 6 speaks in mandatory terms that imply a constitutional duty. Ordinarily, when the term 'shall' is used in a legal document, it is construed as mandatory and judicially enforceable."); see also *Abbeville County School Dist. v. State*, 335 S.C. 58, 67, 515 S.E.2d 535 (1999) (" 'The provisions of the Constitution shall be taken, deemed, and construed to be mandatory and prohibitory, and not merely directory, except where expressly made directory or promissory by its own terms.' Since the education clause uses the term 'shall,' it is mandatory.").

The Kansas Supreme Court made a similar declaration in 1874 in *Comm'rs of Sedgwick Co. v. Bailey*, 13 Kan. 600, 607, 1874 WL 760 (1874):

"It would be a dangerous doctrine to announce, that any of the provisions of the constitution may be obeyed or disregarded at the mere will or pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of the instrument."

This plain language in Article 6, Sections 1 and 6(b), which reflects the assignment of mandatory constitutional duties to the Kansas Legislature, is in sharp contrast to another section of Article

6, where the language is equally plain—but reflecting legislative discretion. Notably, Section 6(b) expressly orders that "[t]he legislature *shall* make suitable provision for finance" for K-12, but it later states that for higher education "[t]he legislature *may* authorize the state board of regents to establish tuition, fees and charges and institutions under its supervision." (Emphasis added.)

And on that same issue of higher education, Article 6, Section 6(a) provides further discretion to the legislature:

"The legislature *may* levy a permanent tax for the use and benefit of state institutions of higher education and apportion among and appropriate the same to the several institutions, which levy, apportionment and appropriation shall continue until changed by statute. Further appropriation and other provision for finance of institutions of higher education *may* be made by the legislature." (Emphasis added.)

We have long held that constitutions are the work of the people. *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 62-63, 152 P.2d 53 [1944]) ("constitutions are the work not of legislatures or of courts, but of the people"); see *Wright v. Noell*, 16 Kan. 601, 604, 1876 WL 1081 (1876) (None of the qualifications for office prescribed by the constitution may be disregarded because they are "self-imposed by the people upon their otherwise unlimited freedom of choice."). And the intent of the people of Kansas is unmistakable. They voted in 1966 to approve amendments to Article 6 of their 1859 constitution—which amendments included adding these particular provisions. See *State, ex rel., v. Board of Education*, 212 Kan. 482, 484-85, 511 P.2d 705 (1973).

And the people knew full well how to make the legislature's constitutionally assigned tasks simply discretionary, *i.e.*, "the legislature may." Instead, in the very same article—Sections 1 and 6(b)—they chose to approve the amendment drafters' mandatory language, *i.e.*, "[t]he legislature shall." Simply put, the Kansas constitutional command envisions something more than funding public schools by legislative fiat.

The Texas Supreme Court summarized this important point about language selection: "The language of the Constitution must be presumed to have been carefully selected. [Citations omitted.] The framers used the term 'economical' elsewhere and could have

done so here had they so intended." *Edgewood I*, 777 S.W.2d at 395. And the same point was made more than 40 years ago by the Kansas Supreme Court in resolving a similar controversy in education which required review of our constitution. This court held that in examining the constitutional language in Article 6, Section 2(a) and (b), "[w]e assume the difference in treatment accorded the two boards [the State Board of Education and the Board of Regents] was carefully thought out and was meant to have meaning." *State, ex rel., v. Board of Education*, 212 Kan. at 487.

This court made the same general point in 1876 when it rejected a man's argument that a woman who received more votes than he nevertheless was barred by her gender from holding the office of superintendent of public instruction described in Article 6 of the Kansas Constitution:

" '[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written constitutions, *for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing.'* " (Emphasis added.) *Wright v. Noell*, 16 Kan. at 607.

As mentioned, to support its holding in *Neeley*, the Texas Supreme Court also relied upon additional language in its state constitution's mandate to " 'establish and make suitable provision for the support and maintenance of an efficient system of public free schools.' " 176 S.W.3d at 752. Specifically, it held: "If the framers had intended the Legislature's discretion to be absolute, they need not have mandated that the public education system be *efficient* and *suitable*; they could instead have provided only that the Legislature provide whatever public education *it* deemed appropriate." (Emphasis added.) 176 S.W.3d at 778.

So it is important to recognize that "suitable provision" also appears in the Kansas Constitution—when its drafters could instead have provided only that the legislature make "provision" for whatever it deemed appropriate. Indeed, the presence of "suitable provision" in our Article 6 appears to be even more significant than the phrase's presence in the Texas Constitution. Specifically, in the special legislative session of 1966, an effort arose in the Kansas

House of Representatives to change the proposed amendment to Article 6 by deleting "suitable" so the amendment simply would read: "The legislature shall make provision for the finance of schools and other educational interests." House J. 1966 Special Session, p. 15. But this attempt failed on a floor vote of 41 to 60 with 24 absent or not voting. House J. 1966 Special Session, p. 16.

The 1966 legislature's insistence on keeping "suitable" to specifically modify "provision" communicates a clear intention to not give itself absolute discretion in the finance of schools. See *Wright v. Noell*, 16 Kan. at 607 (reasonable to presume every word in constitution has been carefully weighed and none have been inserted without a design for so doing).

This qualifier, together with the constitution's *"shall make . . . provision,"* even further reflects a judicial role in these disputes arising under Article 6. See *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell,* 295 Conn. 240, 259-60, 990 A.2d 206 (2010) (holding that its constitution contains "qualifying terms such as 'appropriate legislation' that imply a judicial role in disputes arising thereunder, particularly when coupled with the word 'shall,' which itself implies a 'constitutional duty' that is 'mandatory and judicially enforceable' ") (citing, *e.g.*, Levy, 54 Kan. L. Rev. at 1051-52).

Moreover, later in 1966 this same constitutional language was obviously approved by the people of Kansas in a statewide election. Their approval sharply contrasts with the rejection by Nebraskans of an amendment to their constitution. In *Nebraska Coalition for Ed. Equity v. Heineman*, 273 Neb. 531, 552, 731 N.W.2d 164 (2007)—a case cited to us by the State to argue nonjusticiability—the Nebraska Supreme Court stated it did not question the importance of the legislature's duty under the Nebraska Constitution to encourage schools. But after noting that in 1996 "the people rejected a recent amendment that would have imposed qualitative standards on the Legislature's duty to provide public education," the *Heineman* court held "if we interpreted that duty to mean that the Legislature must ensure the 'quality' education the [plaintiff] seeks, we would be ignoring the people's clear rejection of that standard in 1996." 273 Neb. at 550, 552-53.

Returning to *Neeley*, there the Texas Supreme Court further noted the Texas Constitution also provides that its systems of public schools be "efficient" —another modifying word the court relied upon to support its holding that the school finance issue was justiciable. *Neeley*, 176 S.W.3d at 776 (quoting *Edgewood I*, 777 S.W.2d at 394). While "efficient" does not appear in Article 6 of the Kansas Constitution, our constitution does contain another qualifier: "improvement." Article 6, Section 1 clearly states: *"The legislature shall provide* for intellectual, *educational*, vocational and scientific *improvement* by establishing and maintaining public schools, educational institutions and related activities." (Emphasis added.) More important, in the 1966 statewide election, the people of Kansas approved substituting this particular language, *i.e.*, "[t]he legislature shall *provide for* . . . improvement," for the language in place since 1859—which stated merely that "[t]he Legislature shall *encourage the promotion* . . . of improvement." (Emphasis added.) Kan. Const. art. 6, § 2 (1859).

The 1966 constitutional change—from the legislature's over 100-year-old assignment under Section 2 to merely "encourage" the promotion of educational improvement to actually "provide for" improvement—is significant. More specifically, it again demonstrates the drafters' intention to not give the legislature carte blanche or absolute discretion in performing its constitutional assignment. To paraphrase the Texas Supreme Court in *Neeley*, if the framers of the amendment had intended the legislature's discretion to be absolute, they need not have *mandated* that the legislature provide for educational *improvement*. They could instead have left Section 2 of the 1859 constitution alone—and allowed the legislature to provide whatever public education *it* deemed appropriate for merely *encouraging* improvement.

Inaction by the drafters of the 1966 amendment or rejection by the people of Kansas would have meant a constitutional provision similar to Indiana's. In *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 520 (Ind. 2009)—another case cited to us by the State to argue nonjusticiability—the Indiana Supreme Court observed that its constitution provided: " '[I]t shall be the duty of the General Assembly to *encourage*, by all suitable means, moral, intellectual,

scientific, and agricultural *improvement.'* . . . Ind. Const. art. 8, §
1." (Emphasis added.) The court described this provision as merely
aspirational.

Because of this key difference from our constitutional language,
we also specifically reject the State's argument that Article 6, Sec-
tion 1 contains only a "general *aspirational* goal of seeking societal
improvement" or is merely "hortatory." For the same reasons, we
reject the State's reliance on a decision by the Iowa Supreme Court
whose constitution is similar to Indiana's. See *King v. State,* 818
N.W.2d 1, 12 (Iowa 2012) *reh. denied* May 24, 2012 (" 'The Gen-
eral Assembly shall *encourage,* by all suitable means, the *promotion
of* intellectual, scientific, moral and agricultural *improvement.'* ").
(Emphasis added.) (quoting Iowa Const., art. IX, div. 2, § 3).

Obviously the 1966 amendment's legislative drafters, at least
two-thirds of both of the legislature's chambers which are required
for a constitutional amendment, and the people of Kansas wanted
more from the legislature. Otherwise these word changes—re-
quiring "suitable provision" for finance instead of simple "provi-
sion" and "provid[ing] for" improvement instead of merely "en-
courag[ing]" it—were meaningless. See *Hawley v. Kansas Dept. of
Agriculture,* 281 Kan. 603, 631, 132 P.3d 870 (2006) (" 'There is a
presumption that the legislature does not intend to enact useless
or meaningless legislation.' "); *Wright v. Noell,* 16 Kan. at 606 (Ac-
cepting defendant's argument would incorrectly make part of con-
stitutional language "manifestly surplusage."); *cf. Rell,* 295 Conn.
at 260 ("[T]he drafters of the [constitution] could have used more
restrictive language, had they wished to avert completely the po-
tential involvement of the judiciary in its enforcement and imple-
mentation.").

In addition, we have essentially made this same point in our prior
decisions about the importance of the presence of "shall" and "im-
provement" in Article 6, Section 1. With the people's approval of
these words, "[t]he Kansas Constitution thus imposes a *mandate*
that our educational system cannot be static or regressive but *must*
be one which 'advance[s] to a better quality or state.' See Webster's
II New College Dictionary 557 (1999) (defining 'improve')." (Em-
phasis added.) *Montoy II,* 278 Kan. at 773. And that mandate is

imposed on the legislature because "[t]he legislature shall provide for . . . educational . . . improvement." Kan. Const. art. 6, § 1.

In short, like the Texas Supreme Court reviewing its constitution, we specifically conclude that through Article 6 of the Kansas Constitution, the people of this state have assigned duties to the Kansas Legislature—which "both empower[] and obligate[]." *Neeley v. West Orange-Cove*, 176 S.W.3d 746, 778 (Tex. 2005). We acknowledge that when determining whether the legislature intended "shall" to be mandatory or directory, we have established four factors to consider. See *State v. Raschke*, 289 Kan. 911, 921, 219 P.3d 481 (2009). Assuming, without deciding, that these factors also apply to the people's intention in their constitution, based upon our prior discussion we conclude the factors clearly point toward "shall" being mandatory. See *State v. Horn*, 291 Kan. 1, 9, 238 P.3d 238 (2010).

Our conclusion today is essentially an affirmation of this same point we made more generally almost 20 years ago. In *U.S.D. No. 229*, 256 Kan. at 252-53, we held that under Article 6, Section 1 the "legislature . . . has the broad *duty* of establishing the public school system" but that section also "places the *responsibility* of establishing and maintaining a public school system on the State." (Emphasis added.) We also held that "the 1966 amendment of Article 6, § 6 specifically placed the 'suitable financing' *responsibility* with the legislature." (Emphasis added.) 256 Kan. at 252.

In addition to the specific similarities addressed above, it is important to further recognize that the Texas Supreme Court's general approach to constitutional questions contains some basic principles similar to ours. Among these substantial commonalities is a recognition by both supreme courts that their state constitutions represent the voice of the people. *Edgewood I*, 777 S.W.2d at 394 ("The Texas Constitution derives its force from the people of Texas. This is the fundamental law under which the people of this state have consented to be governed."); accord *Berentz*, 159 Kan. at 62-63.

Additionally, both the Texas and Kansas Supreme Courts include in their analytical calculuses a consideration of the intent of the people who adopted their constitution, which includes exami-

nation of its plain language. See *Edgewood I*, 777 S.W.2d at 394-95 ("In construing the language of article VII, section 1, we consider 'the intent of the people who adopted it' " and "we rely heavily on the literal text."). As this court ruled almost 40 years ago, a constitution's language

" 'should be held to mean what the words imply to the common understanding of men. In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption, and what appears to have been the understanding of the people when they adopted it.' " *Leek v. Theis*, 217 Kan. 784, 793, 539 P.2d 304 (1975).

See *Wright v. Noell*, 16 Kan. at 607 (for constitutions, "the best and only safe rule for ascertaining the intention of the makers . . . is to abide by the language they have used").

In the instant case, the State obviously has no quarrel with either basic tenet because its brief acknowledges a "constitutional principle, commanded by the people of Kansas through the adoption of the plain language of Article 6, § 6."

Finally, both the Texas and Kansas Supreme Courts include in their analytical calculuses a presumption of constitutionality of the legislature's action. See *Downtown Bar and Grill v. State*, 294 Kan. 188, 192, 273 P.3d 709 (2012) (" '[U]nder the separation of powers doctrine, this court presumes statutes are constitutional and resolves all doubts in favor of a statute's validity.' "); see also *Neeley*, 176 S.W.3d at 777 ("[W]e begin with a presumption of constitutionality.").

In sum, in Article 6 of their constitution the people of Kansas have directed their legislature to perform its duties that the people have created—in compliance with requirements the people have established. This conclusion is consistent with Section 2 of the Kansas Constitution Bill of Rights which has provided since its adoption by the people in 1859: "All political power is inherent in the people, and all free governments are founded on their authority." The presence of all political power in the people is one of the "truths, which lie[s] at the foundation of all republican governments." *Wright v. Noell*, 16 Kan. at 603.

So we reject the State's contention that the first *Baker v. Carr* factor—a textually demonstrable constitutional commitment of the

issue to a coordinate political department, *i.e.*, the legislature—is "inextricable from the case at bar." 369 U.S. at 217.

> *Factor 2: Judicially discoverable and manageable standards exist for resolving the issue.*

The State especially emphasizes this *Baker v. Carr* factor. It argues that "particularly given that the debate now is solely about the *amount* of money appropriated for BSAPP (not the weightings or funding formula as in *Montoy*), judicially discoverable and manageable standards are lacking to determine whether the legislature has made 'suitable provision for finance of the educational interests of the state.' " It observes that some other state supreme courts have concluded that the question of the amount of money to spend on schools is nonjusticiable because there are no judicially discoverable and manageable standards. It cites, *e.g.*, *Coalition for Adequacy and Fairness in School Funding v. Chiles*, 680 So. 2d 400, 406-07 (Fla. 1996); *McDaniel v. Thomas*, 248 Ga. 632, 285 S.E.2d 156 (1981). The State particularly argues that "suitable provision for finance" is amorphous and "suitable" is "extremely vague."

At the outset of our analysis of this second factor, we again find valuable guidance from the Texas Supreme Court in *Neeley*. Several years earlier in that court's *Edgewood I* decision, it had rejected the State's general nonjusticiability argument with its discussion about a legislative duty "not committed unconditionally to the legislature's discretion, but instead . . . accompanied by standards." 777 S.W.2d at 394. In *Neeley* the court directly addressed the state defendants' more specific argument that the second *Baker v. Carr* factor was satisfied because the constitutional standards of adequacy, efficiency, and suitability were judicially unmanageable. 176 S.W.3d at 778.

In rejecting this specific argument, the Texas Supreme Court held that while these constitutional standards "import a wide spectrum of considerations and are admittedly imprecise . . . they are not without content." *Neeley*, 176 S.W.3d at 778. After illustrating extremes, the court observed "in between, there's much else on which reasonable minds should come together, and much over which they may differ. The judiciary is well accustomed to applying

substantive standards the crux of which is reasonableness." 176 S.W.3d at 778. And the *Neeley* court concluded that "[t]he constitutional standards provide an appropriate basis for judicial review and determination." 176 S.W.3d at 779. In reaching its conclusion, the court was careful to observe that its role was not to make education policy but to decide the issues based on the constitutional standards.

The same is true in Kansas. We said in *U.S.D. No. 229* that a role of the courts in resolving an issue under Article 6, Section 6(b) is to determine whether the State has provided "suitable financing," and "not whether the level of finance is optimal or the best policy." 256 Kan. at 254. But the ultimate question on suitability must be one for the court. See 256 Kan. at 254-59. Moreover, there this court quoted with approval the district court's dictionary definition of "suitable" as " 'fitting, proper, appropriate, or satisfactory.' " 256 Kan. at 256-57 (quoting Webster's New Collegiate Dictionary [1977]). Simply put, use of "suitable" necessarily conveys the presence of standards of quality below which schools may not fall.

And contrary to the State's present argument about a lack of judicially discoverable and manageable standards to resolve the issue, we have previously set forth the procedure for the trial court and counsel to handle any plaintiff's "suitable provision" claims:

"*U.S.D. 229* suggested base criteria for determining suitability. The district court must make a finding, *after giving the plaintiffs the opportunity to substantiate their claims*, that the legislature has provided suitable provision for financing the educational interests of the State before judgment may be entered for the defendants regarding the plaintiffs' unsuitability claim." (Emphasis added.) *State v. Montoy*, 275 Kan. 145, 155, 62 P.2d 228 (2003) (*Montoy I*).

Establishing this procedure would be unnecessary if there were no manageable standards for the courts to apply.

These various points about Kansas courts' capacity for adjudging suitability are nicely summarized by one legal commentator:

"Obviously, when it comes to school finance, a wide range of choices might be considered fitting, proper, appropriate, or satisfactory [from *U.S.D. No. 229*, 256 Kan. at 257, defining 'suitable'] and it is clear that the authority to determine what system of finance is suitable belongs in the first instance to the legislature. None-

theless, *it is equally clear that at some point funding can be so inadequate or so inequitable that it cannot possibly be considered suitable. . . . [T]he ordinary understanding of the term 'suitable' encompasses minimum requirements of adequacy and equity.*" (Emphasis added.) Levy, 54 Kan. L. Rev. at 1069.

In other words, our Kansas Constitution clearly leaves to the legislature the myriad of choices available to perform its constitutional duty; but when the question becomes whether the legislature has actually performed its duty, that most basic question is left to the courts to answer under our system of checks and balances. See *U.S.D. No. 229*, 256 Kan. at 254-59. Although it is the courts that have the duty to answer this basic question, "[n]o one would dispute that a public education system limited to teaching first-grade reading would be inadequate" under the constitution. *Neeley*, 176 S.W.3d at 778.

As plaintiffs point out, the Supreme Court of Texas is not the only appellate court supporting our holding. Most state supreme courts have rejected the nonjusticiability argument—which necessarily include those courts that have expressly rejected the contention that no judicially manageable standards were contained in the education articles of their own constitutions. They include states with arguably less specific language than Article 6 of the Kansas Constitution.

Quite illustrative of these courts' decisions is *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993). There, the defendants particularly argued that the constitution's education clause " 'provides no standard against which the quality of education . . . may be judged' " and, therefore, "there is no standard whereby the courts can measure the adequacy of funding or the educational program itself." 851 S.W.2d at 150. The clause provided:

"The State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such postsecondary educational institutions, including public institutions of higher learning, as it determines." Tenn. Const. art. XI, § 12.

In rejecting the state defendants' claim, the Tennessee Supreme Court first held the clause "requires the General Assembly to 'provide for the maintenance, support and eligibility standards of a system of free public schools.' " 851 S.W.2d at 150. It then focused on the definition of "education":

"As used in Article XI, Section 12, the word 'education' has a definite meaning and needs no modifiers in order to describe the precise duty imposed upon the legislature. The first definition of 'education' in the unabridged edition of *The Random House Dictionary of the English Language*, 454 (2d ed. 1987) is: 'The act or process of imparting or acquiring general knowledge, developing the powers of reasoning and judgment, and generally of preparing oneself or others intellectually for mature life.' Indeed, modifiers would detract from the eloquence and certainty of the constitutional mandate—that the General Assembly shall maintain and support a system of free public schools *that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life. Contrary to the defendants' assertion, this is an enforceable standard for assessing the educational opportunities provided in the several districts throughout the state.*" (Emphasis added.) 851 S.W.2d at 150-51.

Similarly, in *Rell*, 295 Conn. 240, the Connecticut Supreme Court found enforceable standards in its state constitution's education clause. Its Article Eighth, Section 1 provided: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." The court acknowledged this language was less specific than that found in some other state constitutions' education clauses, 295 Conn. at 269, but nevertheless held:

"We conclude, consistent with the conclusions of other state courts that have considered similar constitutional guarantees, that article eighth, § 1, of the state constitution . . . embodies a substantive component requiring that the public schools *provide their students with an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting, and to prepare them to progress to institutions of higher education, or to attain productive employment and otherwise to contribute to the state's economy.*" (Emphasis added.) 295 Conn. at 270.

It further explained that "[t]o satisfy this standard, the state, through the local school districts, must provide students with an objectively 'meaningful opportunity' to receive the benefits of this

constitutional right." 295 Conn. at 315 (citing *Neeley*, 176 S.W.3d at 787).

And in *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186 (Ky. 1989), the Kentucky Supreme Court examined its constitution's education clause which simply stated:

*"General Assembly to provide for school system*—The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky. Const. sec. 183.

The *Rose* court held that this constitutional provision "requires the General Assembly to establish a system of common schools that provides an equal opportunity for children to have an adequate .education." 790 S.W.2d at 211. It then articulated standards for measuring compliance with the provision that we cited with approval in *U.S.D. No. 229*, 256 Kan. at 257.

Similarly, other state supreme courts have concluded that discerning standards to interpret their states' education articles is well within their judicial authority. See, *e.g.*, *McDuffy v. Secretary of the Executive Office of Education*, 415 Mass. 545, 615 N.E.2d 516 (1993) (following *Rose* criteria for defining constitutional adequacy); *Claremont School Dist. v. Governor*, 142 N.H. 462, 474-75, 703 A.2d 1353 (1997) (*Claremont II*) (same); *Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249 (1997) (same); *Abbeville County School Dist. v. State*, 335 S.C. 58, 68, 515 S.E.2d 535 (1999) (interpreting constitution to require a "minimally adequate education," which includes "[1] the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; [2] a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and [3] academic and vocational skills"); *Seattle School Dist. v. State*, 90 Wash. 2d 476, 517-18, 585 P.2d 71 (1978) (identifying "broad educational concepts"—designed to allow students to adequately participate in our political system, the labor market, and in the market place of ideas—to guide the legislature in its duty to "make ample provision for the education of all children"). But see, *e.g.*, *McDaniel*, 285 S.E.2d at 165 (while Georgia Constitution stated "[t]he provision of an adequate education for the citizens shall be a pri-

mary obligation of the State," court held "it is primarily the legislative branch of government which must give content to the term 'adequate' ").

We now directly address the narrowest articulation of the overall issue raised by the State. In its brief, it specifically argues "whether the legislature has made 'suitable provision for finance of the educational interests' of the state [is] a nonjusticiable question in the circumstances presented here, *i.e., where plaintiffs simply want more money.*" (Emphasis added.) The State's argument appears to imply that so long as the school funding formula itself is constitutional, then whether it failed to fully or adequately fund the formula is a political question beyond the court's authority to address. As explained below, we must disagree.

In holding the constitutional standards of adequacy, efficiency, and suitability were judicially manageable, the Texas Supreme Court said: "[N]o one would dispute that a public education system . . . *without resources* to accomplish its purposes would be inefficient and unsuitable" under the Texas Constitution. (Emphasis added.) *Neeley*, 176 S.W.3d at 778. The *Neeley* court admitted that the Texas Legislature had a large measure of discretion in determining what kind of education is necessary for the constitutionally required "general diffusion of knowledge" and in determining the means for providing that education. 176 S.W.3d at 784. But the court held that "[i]t would be arbitrary for the legislature to define the goals for accomplishing the constitutionally required general diffusion of knowledge, and then to provide *insufficient* means for achieving those goals." (Emphasis added.) 176 S.W.3d at 784-85. And although the supreme court in *Neeley* reversed the district court's ruling that the system was unconstitutional because of insufficient funding, it did so on the basis of the evidence and findings in the record—not because challenging "the amount of money" appropriated was a nonjusticiable political question. 176 S.W.3d at 789-90.

Other state supreme courts have reached similar conclusions. See *Rell*, 295 Conn. at 266 ("The judicial role is limited to deciding whether certain public educational systems, as presently constituted *and funded,* satisfy an articulated constitutional standard."

[Emphasis added.]); *Rose*, 790 S.W.2d at 211, 216 ("[T]he system of common schools must be adequately funded to achieve its goals. . . . The General Assembly must provide adequate funding for the system. How they do this is their decision."); see also *McWherter*, 851 S.W.2d at 150 (rejecting argument that the constitution's education clause provides "no standard whereby the courts can measure the adequacy of funding or the educational program itself").

And we essentially made the same point as these supreme courts when we held in 2003:

> *"There is a point where the legislature's funding of education may be so low* that . . . it would be impossible to find that the legislature has made 'suitable provision for finance of the educational interests of the state.' Kan. Const. art. 6, § 6." (Emphasis added.) *Montoy I*, 275 Kan. at 155.

We also observe that courts are frequently called upon, and adept at, defining and applying various, perhaps imprecise, constitutional standards. The Texas Supreme Court in *Neeley* observed that disagreements about the meaning of the state constitutional language "are not unique to the [state's education clause]; they persist as to the meanings and applications of due course of law, equal protection, and many other constitutional provisions. Indeed, those provisions have inspired far more litigation than [the state's education clause] . . . ." 176 S.W.3d at 779.

In addition to the constitutional phrases cited by the *Neeley* court, we note that judicial determinations are required for whether a punishment is "cruel and unusual" under the Eighth Amendment to the United States Constitution. See *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). Additionally, judges must define, and discern the difference between "probable cause"—contained in the Fourth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights Section 15—and "reasonable suspicion." *Cf. State v. Moore*, 283 Kan. 344, 154 P.3d 1 (2007). And like these general constitutional standards, the standards for determining compliance with a state constitution's education clause may be refined over time. See *Rell*, 295 Conn. at 317; see also *U.S.D. No. 229*, 256 Kan. at 258 (" '[T]he issue of suitability is not stagnant; past history teaches that

this issue must be closely monitored.' "); *Claremont II*, 142 N.H. at 474 (A "constitutionally adequate public education is not a static concept removed from the demands of an evolving world.").

In addition to these considerations, we finally observe this court previously has used judicially discoverable and manageable standards in addressing constitutional claims. In *Van Sickle v. Shanahan*, 212 Kan. 426, 439, 511 P.2d 223 (1973), this court considered whether an amendment to the Kansas Constitution authorizing the governor to reorganize existing executive branch agencies or functions violated the Guaranty Clause of the United States Constitution, which provides: "The United States shall guarantee to every State in this Union a Republican form of Government . . . ." U.S. Const. art. IV, § 4.

En route to rejecting the argument that enforcing the Guaranty Clause was a nonjusticiable political question, the *Van Sickle* court held: "There are sufficient historical precedents to delineate judicially discoverable and manageable standards for resolving the issues at bar." 212 Kan. at 439. Among other things, the *Van Sickle* court relied on the constitutional history of the Guaranty Clause and Kansas precedent where this court had discussed the requirements of a republican form of government. 212 Kan. at 450 (citing *Harris v. Shanahan*, 192 Kan. 183, 387 P.2d 771 [1963]; Federalist No. 39; Federalist No. 43).

We therefore reject the State's assertion that the second *Baker v. Carr* factor—a lack of judicially discoverable and manageable standards for resolving the issue—is "inextricable from the case at bar." 369 U.S. at 217.

We next turn our attention to the other two *Baker v. Carr* factors which the State argues also "are inextricable from the case at bar," rendering the issues nonjusticiable because they are political questions. We begin our examination of them by first recognizing that the United States Supreme Court has held that the *Baker v. Carr* factors were "probably listed in descending order of both importance and certainty." *Neeley*, 176 S.W.3d at 778 n.170 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278, 124 S. Ct. 1769, 158 L. Ed. 2d 546 [2004]).

*Factor 4: There is no lack of respect due coordinate branches of government.*

The State argues that "it is impossible on this record to affirm the panel without " 'expressing lack of the respect due coordinate branches of government.' " The State then criticizes the panel decision for such things as appropriating more money for base state aid per pupil and enjoining the State from changing the relevant statute, K.S.A. 72-6405 *et seq.* As more fully discussed below, we are not affirming the panel on this remedial issue. Accordingly, the State's argument need not be addressed.

We additionally observe that "[i]t is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself in accordance with the authority conferred upon it by the constitution." *Rell*, 295 Conn. at 267-68; see *Idaho Schools For Equal Educ. v. Evans*, 123 Idaho 573, 850 P.2d 724 (1993) ("[W]e decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us."); *Rose*, 790 S.W.2d at 209 (1989) (to allow the legislature "to decide whether its actions are constitutional is literally unthinkable"); *Neeley*, 176 S.W.3d at 777 (" 'The final authority to determine adherence to the Constitution resides with the judiciary' "; if "the legislature has not discharged its constitutional duty . . . it is *our* duty to say so.").

We therefore reject the State's assertion that the fourth *Baker v. Carr* factor is inextricable from the case at bar.

*Factor 6: There is no potentiality of embarrassment from multifarious pronouncements by various departments on one question.*

The State also briefly suggests that this *Baker v. Carr* factor is met because by tinkering with one part of the school finance system, *e.g.*, enjoining the capital outlay statute, "the panel disrupted an intricate, interwoven system, probably in ways the panel never even contemplated." But the State is unclear how this argument allegedly implicates the sixth *Baker v. Carr* factor. *Cf. State v. Torres*, 280 Kan. 309, Syl. ¶ 7, 121 P.3d 429 (2005) (simply pressing a point without pertinent authority, or without showing why it is

sound despite a lack of supporting authority, is akin to failing to brief an issue; when party fails to brief an issue, it is waived or abandoned). We therefore reject the State's assertion that the sixth factor is inextricable from the case at bar.

Contained within this political question discussion is a recognition that under the Kansas Constitution many entities play roles in public education in Kansas. Playing one major role are the people of Kansas, who approved the Kansas Constitution in 1859 and its Article 6 amendments in 1966. *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 62-63, 152 P.2d 53 (1944). As previously noted, it also includes the legislature, created and empowered, but obligated, by the constitution created by the people. See Kan. Const. art. 2, § 1 and art. 6, §§ 1, 2, 3, and 6.

Also playing roles are the local boards of education, the State Board of Education, and the Board of Regents. Like the legislature, these entities were created, empowered, and obligated by the constitution created by the people. See Kan. Const. art. 6, §§ 2, 3, and 5; *State, ex rel., v. Board of Education*, 212 Kan. 482, 485, 511 P.2d 705 (1973) (explaining constitutional interplay among these educational entities: the State Board of Education has general supervision over public schools and educational interests of the State except functions delegated by law to the State Board of Regents [art. 6, § 2(a)]; the Board of Regents controls and supervises public institutions of higher education [art. 6, § 2(b)]; local public schools shall be maintained, developed, and operated by locally elected boards under the general supervision of the State Board of Education [art. 6, § 5]).

As for the constitutional relationship between the legislature and the State Board of Education, this court has made clear that the general supervisory powers of the board under Article 6, Section 2(a) are "self-executing," *i.e.*, not requiring empowerment by the legislature. See *State, ex rel.*, 212 Kan. at 486. And this power "could not be thwarted by legislative failure to adopt supplementary legislation." 212 Kan. at 486.

As for the constitutional relationship between the legislature and local school boards, as mentioned previously the legislature does not have "carte blanche over the duties and actions of local school

boards." *U.S.D. No. 380 v. McMillen*, 252 Kan. 451, 464, 845 P.2d 676 (1993). Rather, their respective constitutional duties and obligations "must be read together and harmonized so both entities may carry out their respective obligations." 252 Kan. at 464. Moreover, the executive branch obviously enforces the laws. See Kan. Const. art. 1, § 1; *Van Sickle*, 212 Kan. at 440 ("Generally speaking, . . . the executive power is the power to enforce the laws.").

Under Article 3, Section 1 of the Kansas Constitution, the courts also have a role. As this court said after 9 years of statehood, " '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " *Auditor of State v. A.T.&S.F. Railroad Co.*, 6 Kan. 500, 506, 1870 WL 507 (1870) (quoting *Marbury v. Madison*, 5 U.S. [1 Cranch] 137, 2 L. Ed. 60 [1803]). And as we confirmed more than 100 years later, "[t]he final decision as to the constitutionality of legislation rests exclusively with the courts. . . . [T]he judiciary's sworn duty includes judicial review of legislation for constitutional infirmity." *Montoy v. State*, 279 Kan. 817, 826, 112 P.3d 923 (2005) (*Montoy III*) (also citing United States Supreme Court *Marbury* decision).

We conclude from this constitutional assignment of different roles to different entities that the people of Kansas wanted to ensure that the education of school children in their state is not entirely dependent upon political influence or the voters' constant vigilance. As the panel declared, "[m]atters intended for permanence are placed in constitutions for a reason—to protect them from the vagaries of politics or majority. A change in the messenger does not change the message."

Finally, we observe that in *Neeley*, the Texas Supreme Court held that like the majority of states, "we conclude that the separation of powers does not preclude the judiciary from determining whether the legislature has met its constitutional obligation to the people to provide for public education." 176 S.W.3d at 780-81.

We made a similar point in *Montoy III*, where we approvingly quoted the Arkansas Supreme Court, *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 54-55, 91 S.W.3d 472 (2002), and that court itself approvingly quoted *Rose*, 790 S.W.2d 186. In *Rose*, the Kentucky Supreme Court rejected the State's argument that the

separation of powers doctrine prevented judicial review of the educational statutes for constitutionality. See 790 S.W.2d at 208-09. As the Arkansas court stated:

"The Supreme Court of Kentucky has emphasized the need for judicial review in school-funding matters. The language of that court summarizes our position on the matter, both eloquently and forcefully, and we adopt it:

'Before proceeding . . . to a definition of "efficient" we must address a point made by the appellants with respect to our authority to enter this fray and to "stick our judicial noses" into what is argued to be strictly the General Assembly's business.

. . . .

'. . . [In this case] we are asked—based solely on the evidence in the record before us—if the present system of common schools in Kentucky is "efficient" in the constitutional sense. *It is our sworn duty to decide such questions when they are before us by applying the constitution. The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted the social compact called the constitution and in it provided for the existence of a third equal branch of government, the judiciary.*

. . . .

'. . . *To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.*

. . . .

'The judiciary has the ultimate power, and the duty, to apply, interpret, define, and construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.' " (Emphasis added.) 351 Ark. at 54-55, *as quoted in Montoy III*, 279 Kan. at 827.

This acknowledgment of the courts' delicate, but solemn, duty did not originate in Kansas with the *Montoy* court. As former Kansas Attorney General and Supreme Court Justice Harold Fatzer explained more than 50 years ago about the separation of powers and the court's respective duties:

"There should be no misunderstanding as to the function of this court . . . . It is sometimes said that courts assume a power to overrule or control the action of the people's elected representative in the legislature. This is a misconception. . . . [C]onforming to concepts inherent in American republican form of government,

the Constitution of Kansas distributes the powers of government to three distinct and separate departments, *i.e.*, the Executive, Legislature, and Judicial. The judiciary interprets, explains and applies the law to controversies concerning rights, wrongs, duties and obligations arising under the law and *has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people.*" (Emphasis added.) *Harris*, 192 Kan. at 206.

Justice Fatzer went on to further explain the court's duty within the Kansas constitutional structure:

"In this sphere of responsibility courts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. . . . [But] [i]n the final analysis, the court is the sole arbiter of the question of whether an act of the legislature is invalid under the Constitution of Kansas. (*Quality Oil Co. v. du Pont & Co.*, 182 Kan. 488, 493, 322 P.2d 731 [1958]). *However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it.*" (Emphasis added.) 192 Kan. at 206-07.

Because we hold a justiciable case or controversy exists, we now proceed to the merits of the case.

### MERITS OF THE CASE

A more complete historical overview than that provided in the Facts and Procedural History is important to an analysis of the merits. As discussed in *U.S.D. No. 229*, by 1994 this court had a substantial history with school finance litigation.256 Kan. at 241-43. *Montoy* was then presented to this court in 2003, resulting in a series of opinions. Our first opinion reversed the district court's dismissal of the case on procedural grounds and returned it to that court. Our second opinion reviewed the district court's trial findings on the merits and the third and fourth dealt with remedies.

After our first *Montoy* decision, we remanded the case to the district court, and it made its findings. *Montoy* then returned here in the context of the lower court's determination that the failure to base the financing formula on a "cost analysis distorted the low enrollment, special education, vocational, bilingual education, and the at-risk student weighting factors." *Montoy v. State*, 278 Kan. 769, 775, 120 P.3d 306 (2005) (*Montoy II*). This court found substantial competent evidence supported the district court's findings and the findings were sufficient to support its "conclusion that the legislature has failed to 'make suitable provisions for finance' " of

K-12 education under Article 6. 278 Kan. at 772, 775. The court withheld the mandate to provide the legislature the opportunity to adopt corrective legislation. 278 Kan. at 776.

After the legislature responded, the plaintiff school districts argued to this court that the new legislation, which included some increased funding, fell " 'grossly short of what is actually necessary to provide a constitutionally suitable education.' " *Montoy III*, 279 Kan. at 823. During this remedy stage of the litigation, it became the State's burden to persuade this court that the new legislation cured the constitutional infirmities of the prior law. *Montoy III*, 279 Kan. at 826.

In considering the State's arguments of compliance, we focused on the legislature's own definition of a "suitable education" and the estimated costs required for schools to comply with that standard. We used this particular analytical framework for several reasons. After defining its standard, the legislature commissioned a study (Augenblick & Myers) to determine the cost of providing such education with criteria established by the Legislative Education Planning Committee and others. The Augenblick & Myers study had been admitted at trial—indeed, was the only cost evidence presented—and became part of the record on appeal. Moreover, the defendants State Board of Education and State Department of Education had previously recommended to the legislature that the study be adopted and funded accordingly.

Relying on the data from the legislature's study, we concluded that various provisions of the new legislation "substantially var[y] from any cost information in the record." *Montoy III*, 279 Kan. at 831. We again provided the legislature the opportunity to adopt corrective legislation.

Following a legislative post audit study of costs, we eventually ended the *Montoy* litigation based on new legislation providing for more than $750 million in additional education funding. This additional infusion of funds from the legislature would have approached the cost estimates in its Augenblick & Myers study—estimates essentially confirmed in its legislative post audit study. Accordingly, we held that the projected funds would "substantially" comply with the level established in those studies, *i.e.*, an

amount reasonably close to the funds necessary for schools to meet the legislature's own standards for an adequate education. *Montoy v. State*, 282 Kan. 9, 21-22, 138 P.3d 755 (2006) (*Montoy IV*). But the full amount of the promised funding was not provided, which in turn led to the litigation in the present case.

*Montoy*'s focus on cost estimate studies arose from the specific circumstances of that case, primarily in this court's evaluation of a remedy. So we essentially agree with the State's suggestion in its brief that "actual costs may have been relevant to that [*Montoy*] case, based upon that record at that time." As the State contends, *Montoy* was not meant to suggest that cost estimates are the proper measures of whether the State has provided the education required under Article 6. And *Montoy* did not suggest they would be the exclusive measure. Consequently, today we must clarify the proper tests to be applied.

ADEQUACY

We have consistently held that Article 6 of the Kansas Constitution contains at least two components: adequacy and equity. *Montoy II*, 278 Kan. at 774-75; see *U.S.D. No. 229*, 256 Kan. at 258. We first address adequacy.

*The adequacy test*

A number of courts have adopted the adequacy rationale and definition articulated by the Kentucky Supreme Court in *Rose*, 790 S.W.2d 186. See, *e.g., McDuffy v. Secretary of the Executive Office of Education*, 415 Mass. 545, 617, 615 N.E.2d 516 (1993); *Claremont II*, 142 N.H. at 474; *Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249 (1997); *Abbeville County School Dist. v. State*, 335 S.C. 58, 68, 515 S.E.2d 535 (1999).

We essentially quoted *Rose* with approval in *Montoy III* regarding separation of powers when we quoted the Arkansas Supreme Court, *Lake View Sch. Dist. No. 25*, 351 Ark. at 54-55, and that court itself approvingly quoted *Rose*. See 279 Kan. at 827. And prior to the *Montoy* litigation, in our 1994 decision *U.S.D. No. 229*, 256 Kan. at 256-57, we approvingly quoted the district court, which

discussed *Rose* in its analysis of the adequacy requirement contained in Article 6:

> " 'The standard most comparable to the Kansas constitutional requirement of "suitable" funding is a requirement of adequacy found in several state constitutions. . . .
>
> " 'One of the most frequently cited definitions of an adequate education was one proffered by the Kentucky Supreme Court [in *Rose*.]' "

The *Rose* court announced that an adequate education must contain the following seven "capacities":

> "[A]n efficient system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market." 790 S.W.2d at 212.

The district court in *U.S.D. No. 229* observed that the *Rose* definition of adequacy, as well as those from several other state supreme courts, " 'bear[s] striking resemblance to the 10 statements or goals enunciated by the Kansas legislature in defining the outcomes for Kansas schools, which includes the goal of preparing learners to live, learn, and work in a global society. K.S.A. 72-6439.' " 256 Kan. at 257. The district court eventually consolidated *Rose*'s seven goals of an adequate education into six.

As mentioned, in *Rose* the Kentucky Supreme Court had addressed its constitution's education clause, which simply provided: "The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky. Const. sec. 183. And the *Rose* court held that this language required its legislature to establish a system of common schools

"that provides an equal opportunity for children to have an adequate education." 790 S.W.2d at 211.

In 1995, less than 1 year after this court's decision in *U.S.D. No. 229*, the Kansas Legislature changed the statute referenced in that opinion—K.S.A. 72-6439. See L. 1995, ch. 263, sec. 1; *Montoy II*, 278 Kan. at 773 ("repealing the 10 goals which served as the foundation for measuring suitability in the *U.S.D. No. 229* decision"). But after the release of *Montoy II* in January 2005, later that year the legislature passed K.S.A. 2005 Supp. 72-1127. And as demonstrated below, the legislature's current statutory goals bear even more striking resemblance to the adequacy standards articulated by the Kentucky Supreme Court in *Rose* that this court cited approvingly in *U.S.D. No. 229* 20 years ago.

K.S.A. 2013 Supp. 72-1127(a) currently requires the "subjects and areas of instruction" adopted by the State Board of Education to be taught in "every accredited school." Subsection (b) requires the subjects and areas of instruction adopted by the Board as necessary to meet its graduation requirements to be taught in "every accredited high school." Most important, subsection (c) requires that the Board's design of these subjects and areas of instruction include legislatively specified goals for student achievement:

"(c) Subjects and areas of instruction shall be designed by the state board of education *to achieve the following goals established by the legislature* to allow for the:

(1) Development of sufficient oral and written communication skills which enable students to function in a complex and rapidly changing society." (Emphasis added.)

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization."

"(2) acquisition of sufficient knowledge of economic, social and political systems which enable students to understand the issues that affect the community, state and nation."

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices."

And compare *Rose*, 790 S.W. 2d at 212: "goal to provide . . . (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation."

See *U.S.D. No. 229*, 256 Kan. at 257: district court's consolidation of *Rose* factors (ii) and (iii) to become "sufficient knowledge of economic, social, and political systems to enable the student to understand the issues that affect the community, state, and nation."

"(3) development of students' mental and physical wellness."

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness."

"(4) development of knowledge of the fine arts to enable students to appreciate the cultural and historical heritage of others."

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage."

"(5) training or preparation for advanced training in either academic or vocational fields so as to enable students to choose and pursue life work intelligently."

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently."

"(6) development of sufficient levels of academic or vocational skills to enable students to compete favorably in academics and the job market."

Compare *Rose*, 790 S.W.2d at 212: "goal to provide . . . (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market."

"(7) needs of students requiring special education services."

The *Rose* court constitutional standards have been remarkably paralleled since 2005 by the Kansas Legislature's express educational goals now set forth in K.S.A. 2013 Supp. 72-1127(c). And those statutory goals appear to signal a deliberate legislative deci-

sion to adopt the *Rose* standards as articulated by the district court quoted in *U.S.D. No. 229* 11 years earlier. See, *e.g.,* K.S.A. 2013 Supp. 72-1127(c)(2) and the district court's consolidation of *Rose* factors (ii) and (iii)—"sufficient knowledge of economic, social, and political systems to enable the student to understand the issues that affect the community, state, and nation." 256 Kan. at 257.

It must be acknowledged, however, that while K.S.A. 2013 Supp. 72-1127 appears to represent a deliberate decision by the Kansas Legislature to make its statutory educational goals match the *Rose* standards, *i.e.,* match the constitutional adequacy requirement contained in Article 6, in a future session a different legislature might deliberately decide to lower these statutory standards or goals by simple majority vote. But it must be equally acknowledged that only the people of Kansas—at the statewide ballot box after a two-thirds majority vote by both the House and Senate—have the authority to lower the standards in their constitution. And the people's constitutional standards must always prevail over the legislature's statutory standards should the latter be lower.

For as this court said 111 years ago in *Atkinson v. Woodmansee,* 68 Kan. 71, 74 P. 640 (1903):

" 'The Constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

" *'If the former part of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.' "* (Emphasis added.) 68 Kan. at 90 (quoting *Marbury v. Madison,* 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 [1803]).

The *Atkinson* court continued to quote the 1803 United States Supreme Court *Marbury* decision about the supremacy of the people's constitution over certain legislative actions:

" 'Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently *the theory of every such government must be that an act of the Legislature repugnant to the constitution is void.*

" 'This theory is essentially attached to a written constitution, and is consequently to be considered, by this court, as one of the fundamental principles of

our society.' " (Emphasis added.) 68 Kan. at 90-91 (quoting *Marbury v. Madison,* 5 U.S. [1 Cranch] 137, 177).

In *Neeley* the Texas Supreme Court directly addressed this legislative "lowering of standards" issue and held: " '[T]he Legislature may [not] define what constitutes a general diffusion of knowledge so low as to avoid its obligation to make suitable provision imposed by Article VII, section 1' " of the Texas Constitution. (Brackets in original.) *Neeley v. West Orange-Cove,* 176 S.W.3d 746, 784 (Tex. 2005) (quoting *West Orange-Cove Consol. I.S.D. v. Alanis,* 107 S.W.3d 558, 571 [Tex. 2003] [*West Orange-Cove I*]) (quoting *Edgewood Independent Sch. Dist. v. Meno,* 917 S.W.2d 717, 730 n.8 [1995] [*Edgewood IV*]); *cf. Idaho Schools For Equal Educ. v. Evans,* 123 Idaho 573, 583-84 n.2, 850 P.2d 724 (1993) (while holding certain standards established by state board of education pursuant to legislative directive were consistent with court's "view of thoroughness" contained in state constitution, holding of constitutional compliance limited to board's standards "as they exist today").

Just as only the people of Kansas have the authority to change the standards in their constitution, the Supreme Court of Kansas has the final authority to determine adherence to the standards of the people's constitution. See *Harris,* 192 Kan. at 207 ("In the final analysis, this court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas."); accord *Neeley,* 176 S.W.3d at 777 ("The final authority to determine adherence to the Constitution resides with the Judiciary."); *Rose,* 790 S.W.2d at 209 (The judiciary's power and duty to interpret the constitution "must be exercised even when such action serves as a check on the activities of another branch of government.").

These distinctions and their accompanying hierarchy—that the people's constitutional standards must prevail over the legislature's statutory standards which may be lower and that the court is the sole arbiter of that issue—was well made in *State v. Montoy,* 275 Kan. 145, 62 P.3d 228 (2003) (*Montoy I*). There we again examined the 1994 decision in *U.S.D. No. 229,* 256 Kan. 232, and observed that

*"U.S.D. 229 relied on the legislature to promulgate standards but asserted that the ultimate question on suitability must be one for the court.* Accreditation is a 'base,' but *U.S.D. 229* also quoted the following caveat from the district court in that case:

'"[T]he issue of suitability is not stagnant: past history teaches that this issue must be closely monitored. Previous school finance legislation, when initially attacked upon enactment or modification, *was determined constitutional. Then, underfunding and inequitable distribution of finances lead to judicial determination that the legislation no longer complied with constitutional provisions."*' 256 Kan. at 258, 885 P.2d 1170." (Emphasis added.) *Montoy I,* 275 Kan. at 153.

We returned to these distinctions and hierarchy in *Montoy II.* We acknowledged and reinforced the point in *Montoy I* that there "we concluded that [the legislature's] accreditation standards may not always adequately define a suitable education" as required under the Kansas Constitution. *Montoy II,* 278 Kan. at 774 (citing *Montoy I,* 275 Kan. at 153-55). And in *Montoy II,* we clearly held that the concept of " 'suitable provision for finance' " must, among other things, and perhaps primarily, "reflect a level of funding which meets *the constitutional requirement* that '[t]he legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools . . . .' . . . Kan. Const. art. 6, § 1." (Emphasis added.) 278 Kan. at 773. But the strength of these initial statements was later diluted by our primary focus on cost estimates—a focus that evolved in the *Montoy* litigation because of how the issues were presented to us by the district court and due to the remedial nature of some of our decisions.

Admittedly, this court could have been more explicit throughout the *Montoy* litigation in buttressing the point established in *Montoy I* that the standards chosen during a particular legislative session do not necessarily equate to the standards chosen by the people in their constitution. See *Evans,* 123 Idaho at 584 n.2 (The court limited its holding of constitutional compliance to state board of education's "standards as they exist today. We express no opinion as to whether the IDAPA standards would be consistent with that definition [of thoroughness] if the Board of Education were to amend them."). And that vital point is summarized by acknowl-

edging that all political power is inherent in the people, all free governments are founded on their authority, and the constitution is their creation. Kan. Const. Bill of Rights, § 2; *Berentz v. Comm'rs of Coffeyville*, 159 Kan. 58, 62-63, 152 P.2d 53 (1944); *Wright v. Noell*, 16 Kan. 601, 603, 1876 WL 1081 (1876).

Although we have approvingly discussed *Rose* in several prior decisions, beginning with *U.S.D. No. 229* in 1994, we have never expressly adopted the *Rose* court's articulated standards like other supreme courts. We do so now—for the education adequacy requirement we have held is contained in Article 6 of the Kansas Constitution. And like the *Rose* court, we consider them minimal standards. See *Rose*, 790 S.W.2d at 212 n.22 ("[T]hese seven characteristics should be considered as minimum goals in providing an adequate education.").

With our adoption of *Rose*, we now clarify what Article 6 of our constitution requires. We hold its adequacy component is met when the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2013 Supp. 72-1127.

This test necessarily rejects a legislature's failure to consider actual costs as the litmus test for adjudging compliance with the mandates of Article 6. For example, even if a legislature had not considered actual costs, a constitutionally adequate education nevertheless could have been provided—albeit perhaps accidentally or for worthy non-cost-based reasons. And actual costs from studies are more akin to estimates than the certainties the panel suggested. Nevertheless, actual costs remain a valid factor to be considered during application of our test for determining constitutional adequacy under Article 6.

The *Gannon* panel acknowledged it used the *Montoy* case as "the template" for determining legislative compliance with the constitutional mandate expressed in Article 6, Section 6(b). But the panel essentially used only *Montoy*'s statements about basing the financing formula or funding decisions upon "actual costs" as its exclusive test for constitutional compliance. The panel found the

legislature did not consider the actual costs, *i.e.*, the studies by Augenblick & Myers or legislative post audit, of providing a "constitutionally suitable education" in making its appropriations in its annual sessions from 2009 through 2012. The panel concluded, perhaps from this finding alone, "that plaintiffs have established beyond any question the state's K-12 educational system now stands as *unconstitutionally underfunded*." (Emphasis added.)

Because the panel understandably did not apply our *Rose*-based test when it extended *Montoy* to exclusively focus on cost estimates, the panel made no findings arising from that test that we may review. So we must remand for the panel to make an adequacy determination, complete with findings, after applying the test to the facts. We express no opinion whether the panel needs to reopen the record to make its adequacy determination. That decision is best left to the panel as the factfinder.

In the panel's assessment, funds from all available resources, including grants and federal assistance, should be considered. The legislative history of Article 6 reveals the intent to provide a system of educational finance that is sufficiently flexible to be able to utilize such sources. See Kansas Legislative Council, *The Education Amendment to the Kansas Constitution*, pp. 31-32 (Publication No. 256, December 1965) (noting "[t]he advisory committee emphasized that the legislature should have specific broader powers . . . in matching federal funds" and expressing intent that Article 6 provide "greater flexibility . . . in . . . matching new federal and private grants"). We appreciate the panel's concern about overreliance on unpredictable federal funding. But there was an obvious increase in federal monies during the years at issue in this litigation, and the legislature was constitutionally empowered to respond with adjustments in state spending. Moreover, state monies invested in the Kansas Public Employees Retirement System (KPERS) may also be a valid consideration because a stable retirement system is a factor in attracting and retaining quality educators—a key to providing an adequate education.

The panel may consider the restrictions on the use of these federal, pension, and other funds and determine that even with the influx of these additional monies the school districts are unable to

use them in the manner necessary to provide adequacy under Article 6. But regardless of the source or amount of funding, total spending is not the touchstone for adequacy.

In short, the panel should apply the *Rose*-based test articulated in this opinion for adequacy in school finance to the evidence it deems relevant to its analysis, recognizing the test does not require the legislature to provide the optimal system. See *U.S.D. No. 229*, 256 Kan. at 254 (issue is whether SDFQPA satisfies the constitution by providing suitable financing, not whether level of finance is optimal or the best policy). While the wisdom of the legislature's policy choices in allocating financial resources is not relevant to this analysis, the panel can consider how those choices impact the State's ability to meet the *Rose* factors. Ultimately, the panel must assess whether the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and as presently codified in K.S.A. 2013 Supp. 72-1127.

## EQUITY

### *The equity test*

This court has frequently spoken of the equity requirement in Kansas education litigation. See, *e.g., Montoy v. State*, 279 Kan. 817, 840, 112 P.3d 923 (2005) (*Montoy III*) ("extraordinary declining enrollment provisions cannot be allowed to exacerbate inequities"); *Montoy II*, 278 Kan. at 775 ("equity with which the funds are distributed . . . [is] critical factor[] for legislature to consider in achieving a suitable formula for financing education"); *U.S.D. No. 229*, 256 Kan. at 258 (" 'inequitable distribution of finances' "); *cf. Provance v. Shawnee Mission U.S.D. No. 512*, 231 Kan. 636, 643, 648 P.2d 710 (1982) ("The ultimate State purpose in offering a system of public schools is to provide an environment where quality education can be afforded equally to all.").

And as this court held more than 40 years ago when discussing the purposes of the Unified School District Act of 1963:

"Some school districts increased rapidly in taxable wealth while others remained relatively static. It appeared desirable therefore to make changes in our educa-

tional system to secure equal educational opportunities for the children in different districts. *Changes seemed necessary to equalize the tax burdens brought on by population shifts.*" (Emphasis added.) *Hand v. Board of Education*, 198 Kan. 460, 464, 426 P.2d 124 (1967).

One legal commentator has illustrated equity's important position in education finance:

"[A]t some point funding can be so inadequate or so inequitable that it cannot possibly be considered suitable. . . . [E]ven if the total appropriation for schools is ample, a system of finance that allocated the entire amount to half of the school districts in the state, while leaving the other half with none, cannot be considered a suitable provision for finance." Levy, *Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation*, 54 Kan. L. Rev. 1021, 1069 (2006).

While this court has often spoken of the requirement of equity in this area, it has not clearly defined the term. Perhaps our clearest guidance came in *Montoy IV*, where we held equity was not necessarily the equivalent of equality: "Equity does not require the legislature to provide equal funding for each student or school district. In *Montoy II*, we rejected the plaintiffs' claim that the school finance act violated the Equal Protection Clause of the United States and Kansas Constitutions." *Montoy v. State*, 282 Kan. 9, 22, 138 P.3d 755 (2006) (*Montoy IV*); *cf. U.S.D. No. 229*, 256 Kan. at 259-68 (rejecting Blue Valley plaintiffs' claim that the SDFQPA violated the right of equal protection contained in Section 1 of the Kansas Constitution Bill of Rights).

And in the *Montoy* litigation, we spoke repeatedly of increasing and exacerbating inequities. For example, in *Montoy III*, when discussing the local option budget (LOB) we held:

"We also agree with the plaintiffs and the Board that, in fact, *the legislation's increase in the LOB cap exacerbates the wealth-based disparities between districts.* Districts with high assessed property values can reach the maximum LOB revenues of the 'district prescribed percentage of the amount of state financial aid determined for the district in the school year' (K.S.A. 72-6433[a][1], amended by S.B. 43, sec. 17) with far less tax effort than those districts with lower assessed property values and lower median family incomes. Thus, the wealthier districts will be able to generate more funds for elements of a constitutionally adequate education that the State has failed to fund." (Emphasis added.) *Montoy III*, 279 Kan. at 834.

Accordingly, we concluded that "the inequity-producing local property tax measures mean that the school financing formula . . . still falls short of the standard set by Article 6, § 6 of the Kansas Constitution." 279 Kan. at 840.

The Texas Supreme Court faced an analogous issue in *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391 (Tex. 1989) (*Edgewood I*). There, the court observed that school districts provide about 50% of total education costs. However, "[t]here are glaring disparities in the abilities of the various school districts to raise revenues from property taxes because taxable property wealth varies greatly from district to district." 777 S.W.2d at 392. The *Edgewood I* court observed:

"The lower expenditures [per each student] in the property-poor districts are not the result of lack of tax effort. Generally, the property rich districts can tax low and spend high, while the property poor districts must tax high merely to spend low." 777 S.W.2d at 393.

After reviewing the requirement in the Texas Constitution for "an efficient system of public free schools," the supreme court concluded:

"We hold that the state's school financing system is neither financially efficient nor efficient in the sense of providing for a 'general diffusion of knowledge' statewide, and therefore that it violates article VII, section 1 of the Texas Constitution. Efficiency does not require a per capita distribution, but it also does not allow concentrations of resources in property-rich school districts that are taxing low when property-poor districts that are taxing high cannot generate sufficient revenues to meet even minimum standards. There must be a direct and close correlation between a district's tax effort and the educational resources available to it; *in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort. Children who live in poor districts and children who live in rich districts must be afforded a substantially equal opportunity to have access to educational funds.* Certainly, this much is required if the state is to educate its populace efficiently and provide for a general diffusion of knowledge statewide." (Emphasis added.) 777 S.W.2d at 397.

Based upon our caselaw set forth above, we agree with the principles expressed by the Texas Supreme Court. Education in Kansas is not restricted to that upper stratum of society able to afford it. Such a result would be generally inconsistent with the economic philosophy inherent in Article 6, Section 6(b) of the people's con-

stitution that prohibits the charging of tuition for attendance at any public school to pupils required by law to attend them.

Our test for equity in K-12 public education finance is clarified and succinctly stated as follows: School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort. Simply put, equity need not meet precise equality standards. As the Vermont Supreme Court has held, "[m]oney is clearly not the only variable affecting educational opportunity, but it is one that government can effectively equalize." *Brigham v. State*, 166 Vt. 246, 256, 692 A.2d 384 (1997).

With this test established, we now turn to the major equity holdings of the panel in its 250-page memorandum opinion and entry of judgment.

*The panel correctly held the State created unconstitutional, wealth-based disparities by eliminating all capital outlay state aid payments to which certain school districts were otherwise entitled under K.S.A. 2012 Supp. 72-8814(c).*

The State argues that the panel erred in concluding that the State created unconstitutional, wealth-based disparities by eliminating all capital outlay state aid payments to which school districts were otherwise entitled under K.S.A. 72-8801 *et seq.* We agree with the panel's findings and hold unreasonable, wealth-based disparities were created—or perhaps reinstated—by the State's withholding of those payments in violation of Article 6.

*Standard of review*

This issue raises mixed questions of fact and law. When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. See *Progressive Products, Inc. v. Swartz*, 292 Kan. 947, 955, 258 P.3d 969 (2011). "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). In determining whether substantial competent evidence supports the district court findings,

appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. *Unruh v. Purina Mills*, 289 Kan. 1185, 1196, 221 P.3d 1130 (2009).

The panel's conclusions of law based on those findings are subject to unlimited review. See *Progressive Products*, 292 Kan. at 955.

### Discussion

As noted, boards of education may adopt a resolution to impose additional mill levies on taxable tangible property in their school districts to exclusively pay for capital improvements such as construction and maintenance of new buildings, as well as for purchase of certain equipment and authorized investments. K.S.A. 2013 Supp. 72-8801; K.S.A. 72-8804. According to the Kansas Department of Education, purchases could include items as varied as science and laboratory equipment, computers, and buses. The resolution is subject to protest petition, and the levy is currently capped at 8 mills. K.S.A. 2013 Supp. 72-8801(a), (b).

In addition to direct revenues from their capital outlay mill levies, the levying districts with lower property wealth qualify for extra monies from the "school district capital outlay state aid fund." See K.S.A. 2013 Supp. 72-8814. Each fiscal year, a district that levies taxes for capital outlay may be entitled to aid equal to the amount levied by the district multiplied by that district's state aid percentage factor. A district's state aid percentage factor is calculated by first determining the median assessed valuation per pupil (AVPP) of all school districts rounded to the nearest $1,000. For every $1,000 a district's AVPP is above the median AVPP, its state aid percentage factor is decreased by 1%. For every $1,000 a district's AVPP is below the median AVPP, its state aid percentage factor is increased by 1%. The state aid computation percentage is 25%. K.S.A. 2013 Supp. 72-8814(b)(4). So, a hypothetical district in which the AVPP is $10,000 below the median AVPP would have a state aid percentage factor of 35%, which would entitle it to capital outlay payments in an amount equal to its capital outlay levy revenues multiplied by 35%. A district's state aid percentage factor may not exceed 100%. See K.S.A. 2013 Supp. 72-8814(b).

The legislature authorized capital outlay state aid payments during the 2006, 2007, and 2008 legislative sessions for fiscal years 2007, 2008, and 2009, respectively. But during the 2009 legislative session it did not authorize those payments for fiscal year 2010 and has failed to do so since. While the 2009 legislature admittedly made a "no limit" appropriation for capital outlay for fiscal year 2010 it did not provide funding for those payments. L. 2009, ch. 124, sec. 66(b).

For fiscal year 2011, the 2010 legislature also made a "no limit" appropriation. But it also used the omnibus appropriations bill to explicitly prohibit the transfer of monies from the state general fund to the school district capital outlay state aid fund, as required by K.S.A. 2010 Supp. 72-8814(c), in fiscal years 2011 and 2012. L. 2010, ch. 165, secs. 79(b), 144(c). For fiscal years 2012, 2013, and 2014, various legislatures made a specific appropriation of "$0" for capital outlay aid, and again amended 72-8814(c) to prohibit transfers for a period of time. See L. 2011, ch. 118, secs. 113(b), 179(c); L. 2012, ch. 175, secs. 88(b), 154(c); and L. 2013, ch. 136, secs. 143(b), 265(c). As a result, subsection (c) currently provides:

"The [Kansas State Board of Education] shall certify to the director of accounts and reports the entitlements of school districts determined under the provisions of subsection (b), and an amount equal thereto shall be transferred by the director from the state general fund to the school district capital outlay state aid fund for distribution to school districts, *except that no transfers shall be made from the state general fund to the school district capital outlay state aid fund during the fiscal years ending June 30, 2013, June 30, 2014, June 30, 2015, or June 30, 2016.*" (Emphasis added.) K.S.A. 2013 Supp. 72-8814(c).

Using plaintiff U.S.D. No. 259 as an example, the panel found that the Wichita district would have been entitled to approximately $4.3 million in capital outlay state aid payments during fiscal year 2012. It further found there was no evidence indicating that the district no longer needed those funds, *i.e.*, there was no factual basis for eliminating the payments.

The panel determined that the funds normally used for districts' capital outlay expenditures would instead probably have had to come from other funds, *e.g.*, LOB funds or BSAPP-generated funds that logically would have to be diverted from their own par-

ticular intended uses. The panel therefore concluded that the lack of capital outlay state aid funding distorted and exacerbated wealth-based disparities, *i.e.*, inequities among districts.

The panel further held that while K.S.A. 72-8801 *et seq.* was constitutional, K.S.A. 2011 Supp. 72-8814(c)'s elimination of capital outlay state aid payments for fiscal years 2012 and 2013 rendered the districts' authority to impose a mill levy via K.S.A. 2012 Supp. 72-8801 unconstitutional because it was fully grounded on a wealth-based disparity in the authorization and availability of such funds.

Accordingly, the panel held the statutory authority was inoperable—preventing districts from levying any local tangible property taxes for capital outlay under K.S.A. 2012 Supp. 72-8801. So all districts, including those which had never received any capital outlay state aid, would in turn have to wholly rely on other funds to make any capital outlay expenditures. Per the panel, this result would even further distort and exacerbate the wealth-based disparities among various districts, *i.e.*, in violation of Article 6. But the panel did not find that the state aid computation percentage of 25% contained in 72-8814(b)(4) is itself constitutionally deficient.

The State specifically argues that there is no evidence—and the panel made no finding—that less than full funding of capital outlay state aid has created unequal educational opportunities. The plaintiffs respond with purported examples in the record.

We address these arguments by first observing what is unquestioned: The legislature itself has acknowledged inequity in its school financing structure. More specifically, the legislature originally enacted K.S.A. 2005 Supp. 72-8814 in an attempt to address the differences in property wealth among school districts and their resultant ability to raise revenue. While per K.S.A. 2013 Supp. 72-8801 each board of education may assess a capital outlay tax levy of 8 mills upon taxable tangible property in its district, disparity results because property values subject to those levies vary among districts. As an example of such disparity, the panel observed the extreme differences between the school districts in Galena, U.S.D. No. 499, and Burlington, U.S.D. No. 244. Both are similar in size—

about 800 students—but at opposite ends of the spectrum for assessed property value. The panel found that one mill raises approximately $18,000 to $19,000 in Galena and approximately $350,000 to $400,000 in Burlington.

Not surprisingly, the "school district capital outlay state aid" described and computed in K.S.A. 2013 Supp. 72-8814 is commonly known in Kansas education circles—and repeatedly referred to by the parties and the panel—as capital outlay *equalization* payments. If there was no equalization to be performed, *i.e.*, no inequality or inequity to be solved, the legislature's passage of K.S.A. 2005 Supp. 72-8814 would have been meaningless—a result we assume the legislature did not intend. See *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. 603, 631, 132 P.3d 870 (2006).

According to a Kansas Department of Education spreadsheet in the record, qualifying districts had received equalization payments in fiscal year 2009 of approximately $22 million. Then beginning in fiscal year 2010 the legislature decided to eliminate its solution to this inequality by stopping all equalization payments. While the payments stopped, the panel found the needs they had been designed to address had not: "We have no evidence that the needs intended by these character of payments [capital outlay state aid] abated suddenly in [fiscal year] 2010 and thereafter. Common sense says they would be ongoing."

Addressing the State's specific argument, we conclude the panel drew a reasonable inference of ongoing need from these facts in evidence: Millions of dollars of equalization payments historically made to address need abruptly stopped for all qualifying districts. See *Unruh v. Purina Mills*, 289 Kan. at 1195-96 (appellate court must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court's findings). Once payments have stopped, it logically follows that the inequity the equalization aid was originally designed to cure remains present—when, as here, there is no evidence of record demonstrating that the inequity or inequality disappeared on its own. And the State points us to nothing in the record to demonstrate the problem was cured by other means.

Second, impliedly contained in the panel's finding of past, and ongoing, capital outlay aid need, and its repeated identification of the past and future problem-solving payments as "equalization payments," is a finding of past, and ongoing, unequal educational opportunity. See *Cason v. Geis Irrigation Co.*, 211 Kan. 406, 412, 507 P.2d 295 (1973) ("A general finding of fact by the district court raises a presumption that it found all facts necessary to sustain and support the judgment rendered."). This is borne out by the panel's acknowledgment of the vast disparities in assessed property values between the similarly sized Galena and Burlington school districts—and of the loss of $4.3 million to plaintiff Wichita school district in fiscal year 2012 alone for possible purchase of computers and other equipment.

In short, we find the panel findings are supported by substantial competent evidence. See *Unruh*, 289 Kan. at 1195 (in determining whether substantial competent evidence supports the district court findings, appellate court disregards any conflicting evidence or other inferences that might be drawn from the evidence).

In addressing equity, the panel had strongly denounced wealth-based disparities in education funding, remarking that "[t]hroughout the litigation history concerning school finance in Kansas, wealth based disparities have been seen as an anathema, one to be condemned and disapproved . . . ." Its language choice suggested a "zero tolerance" for any wealth-based disparity, *i.e.*, perhaps requiring the same or higher standard under equal protection law that we rejected in prior school finance decisions. See *Montoy IV*, 282 Kan. at 22 ("In *Montoy II*, we rejected the plaintiffs' claim that the school finance act violated the Equal Protection Clause of the United States and Kansas Constitutions.").

But wealth-based disparities should not be measured against such mathematically precise standards. *Cf. Montoy IV*, 282 Kan. at 22 ("Equity does not require the legislature to provide equal funding for each student or school district."). To violate Article 6, the disparities instead must be unreasonable when measured by our test: School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort.

Nevertheless, we readily conclude the inequity resulting from the withholding of all the capital outlay equalization funding fails our test, *i.e.*, nonpayment creates—or perhaps returns the qualifying districts to—an unreasonable, wealth-based inequity. We would reach the same conclusion applying the principles of equity underlying our decision in *Montoy II*. See, *e.g.*, *Montoy III*, 279 Kan. at 838 (Because the capital outlay provision "is based on local property tax authority, the amount of revenue a district can raise is tied to property value and median family income; thus the failure to provide any equalization to those districts unable to access this funding perpetuates the inequities produced by this component.").

Simply put, we agree with the panel's conclusion. More specifically, the legislature's withholding of all capital outlay equalization payments since fiscal year 2010 renders the operation of 72-8814(c) unconstitutional—whether done by appropriations bill or the provisions of the statute itself, *i.e.*, "no transfers shall be made from the state general fund to the school district capital outlay state aid fund during the fiscal years ending June 30, 2013, June 30, 2014, June 30, 2015, or June 30, 2016." K.S.A. 2013 Supp. 72-8814(c).

The panel held that the unconstitutionality of subsection (c) rendered all of K.S.A. 72-8801 *et seq.* unconstitutional and therefore of "no force and effect from and after July 1, 2013." But it further held that this constitutional infirmity essentially could be cured if the legislature either amended the statute to read as it existed on July 1, 2007, *e.g.*, by striking subsection (c), or if the legislature otherwise "fully funded" the obligation by other means.

We agree that the infirmity can be cured in a variety of ways— at the choice of the legislature. And the legislature should have an opportunity to promptly cure. Any cure will be measured by determining whether it sufficiently reduces the unreasonable, wealth-based disparity so the disparity then becomes constitutionally acceptable, not whether the cure necessarily restores funding to the prior levels.

*The panel correctly held the State created unconstitutional, wealth-based disparities by prorating and reducing all supplemental general state aid payments to which certain school districts were entitled under K.S.A. 2012 Supp. 72-6434.*

The State argues the panel erred in its conclusion regarding local option budgets and supplemental general state aid. More specifically, the State contends the panel erroneously held that the legislature's prorating of the aid beginning in fiscal year 2010 violated the constitutional requirement for equitable, non-wealth-based distribution of education funds among districts.

We agree with the panel that the aid proration violated the constitutional requirement of equity. In other words, the reduction in funds established—through creation or reinstatement—unreasonable, wealth-based disparities among school districts.

*Standard of review*

This issue raises mixed questions of fact and law. So findings of fact are reviewed for substantial competent evidence, and the conclusions of law based on those findings are subject to our unlimited review. See Progressive Products, 292 Kan. at 955.

*Discussion*

As mentioned, the State mandates a levy of 20 mills by local boards of education on taxable tangible property in their districts per K.S.A. 2013 Supp. 72-6431, and it allows a levy of 8 mills by boards for their capital outlay per K.S.A. 72-8801 *et seq.* Additionally, a board may adopt a local option budget (LOB) by resolution in each school year per K.S.A. 2013 Supp. 72-6433 to augment its funding through additional mill levy. The amount of the district's LOB may not exceed the state-prescribed percentage, which is currently set at 31% of the district's state financial aid entitlement. K.S.A. 2013 Supp. 72-6433(a)(1), (b). The state-prescribed percentage is often referred to as the LOB "cap."

If the district adopts an LOB that complies with certain statutory guidelines, the board's resolution authorizing the LOB becomes effective upon adoption without any further public authorization or approval, except when the authorized percentage is in excess of

30% of the district's state financial aid entitlement. See K.S.A. 2013 Supp. 72-6433(c), (e). Then the resolution must be approved by a majority of the qualified electors in the district. K.S.A. 2013 Supp. 72-6433(e). If the district desires to increase its LOB authority beyond the statutory guidelines to an amount at or below 30% of its state financial aid entitlement, the board's resolution is subject to protest petition by the qualified electors in the district. K.S.A. 2013 Supp. 72-6433(d).

The State provides supplemental general state aid to those districts that have adopted an LOB but have an assessed property valuation per pupil (AVPP) under the 81.2 percentile of statewide AVPP. See K.S.A. 2013 Supp. 72-6434. The amount of such aid to which a district is entitled is the product resulting from multiplying the amount of its LOB by a ratio obtained by dividing its AVPP by the AVPP of a theoretical district at the 81.2 percentile. K.S.A. 2013 Supp. 72-6434(a).

The legislature has addressed the scenario when it may have insufficiently appropriated each district's supplemental general state aid entitlement. K.S.A. 2013 Supp. 72-6434(b) establishes proration of the reduced appropriations:

"If the amount of appropriations for supplemental general state aid is less than the amount each district is entitled to receive for the school year, the state board shall prorate the amount appropriated among the districts in proportion to the amount each district is to receive."

It is undisputed the 2009 legislature used its appropriations bill to reduce the amount of supplemental general state aid available in fiscal year 2010—the same year it began withholding capital outlay equalization payments. Based upon this and other substantial competent evidence in the record, the panel found payments per these entitlements were then prorated to 89.5% in fiscal year 2010, 91.7% in 2011, and 86.1% in 2012. Dale Dennis, Deputy Commissioner of Education in charge of school finance, testified that for fiscal year 2013 the proration was scheduled for 80%. An exhibit in the record—a spreadsheet from the Department of Education, which is also undisputed—reveals that supplemental general state aid was reduced by $56,594,224 for fiscal year 2012.

According to the record, the legislature's initial rationale for pro-rating these supplemental general state aid payments, and also for withholding the capital outlay equalization payments, was based on the national economic recession. The record reveals that this original rationale was replaced in later years by a legislative decision to follow a particular economic policy for the state—which included reducing expenditures and in turn greatly reduced general fund revenue. This decision resulted in a continuation of the withholding and proration of these payments.

For the panel's holding, it ruled that the proration of districts' supplemental general state aid entitlements was unconstitutional. Applying an actual cost standard, the panel found that the State had failed to show a cost-based justification for the proration. So it concluded that the legislature's decision to prorate the entitlements was based solely on the amount it desired to appropriate for that purpose.

In challenging the panel's legal conclusions, the State argues that equitable violations of Article 6 must be premised on the actual operation of the SDFQPA, *i.e.*, that inequitable distribution of funding is not unconstitutional if educational adequacy requirements are met. And it contends that there is no evidence showing that any district is unable to provide the "required opportunity for basic public education" because it was unable to raise its LOB mill levy—as wealthier districts could.

The plaintiffs respond that regardless of whether the constitutional or statutory requirements for adequacy are met, equity remains an essential element of Article 6 compliance. And the State's reductions in supplemental general state aid move less wealthy districts back to inequitable education positions.

We begin our analysis by reinforcing our earlier point. Specifically, even if the legislature has met the adequacy requirement contained in Article 6, it may still violate the constitution by failing to meet the article's equity requirement. See *Montoy v. State*, 278 Kan. 769, 774-75, 120 P.3d 306 (2005) (*Montoy II*); *U.S.D. No. 229 v. State*, 256 Kan. 232, 258, 885 P.2d 1170 (1994). The two requirements are separate. See, *e.g.*, *West Orange-Cove Consol. I.S.D. v. Alanis*, 107 S.W.3d 558, 571 (Tex. 2003) (*West Orange-*

*Cove I*) (If $3,500 per student were required for a general diffusion of knowledge under the Texas Constitution, the legislature cannot limit all districts to a funding level of $500 per student as long as there was equal access to this $500 per student.). So we must reject this pure legal argument by the State.

As with capital outlay, we observe that the legislature itself again has acknowledged certain inequity in its school financing structure—by passage of K.S.A. 2005 Supp. 72-6434. Under this statute, the legislature authorized the distribution of supplemental general state aid in recognition of differences in property wealth among school districts and their resultant abilities to augment their funds through LOBs. See *Montoy IV*, 282 Kan. at 16-17 (supplemental general state aid is designed to equalize the ability of districts with lower property wealth to raise money through the use of the LOB). Such a legislative enactment would be meaningless if inequalities were not inherent within the LOB funding scheme. See *Hawley v. Kansas Dept. of Agriculture*, 281 Kan. at 631. Not surprisingly, even the State's brief refers to this particular aid as "equalizing."

As for the plaintiffs' argument that the State has not met the equity requirement in Article 6, we start with the legislature's undisputed decision to abruptly reduce funding to the LOB equalizing mechanism beginning in fiscal year 2010. With no evidence of a cost justification for the reduction, the panel made a reasonable inference that the proration "reflects no other reason than a choice based on the amount of funds desired to be made available" by the legislature. See *Unruh*, 289 Kan. at 1195-96 (appellate court must accept as true the evidence and all the reasonable inferences drawn from the evidence which support the district court findings). And as with the withholding of capital outlay equalization payments, once the general supplemental state aid was reduced, it logically follows that the inequity that equalization aid was designed to cure remains present. The State points to nothing in the record demonstrating that the inequity was eliminated or lessened on its own or by other means.

The panel made several findings of fact regarding the extent of loss of such supplemental aid which are undisputed and supported by substantial competent evidence in the record. Using U.S.D. No.

259, the Wichita district, as an example, the panel performed a series of calculations that quantify the districts' losses.

Wichita's LOB for fiscal year 2012 was authorized at 27% of the amount of state financial aid, for a total of $96,249,466. Under the formula contained in K.S.A. 2013 Supp. 72-6434, at 100% of its entitlement to general supplemental state aid it would have received $43,793,507, leaving $52,455,959 to be funded by local LOB mill levy. But because the aid was prorated at 86.1% for that year, Wichita's entitlement of $43,793,507 was reduced to $37,706,210—a loss of $6,087,297, or about 6% of its authorized LOB. So the reduction in aid technically increased the district's local responsibility by that $6,087,297 to $58,543,256.

The record shows similar losses experienced by the other plaintiff districts. Due to the proration of aid in fiscal year 2012, Hutchison lost $736,135, or about 8% of its authorized LOB; Dodge City lost $1,422,457, or about 10% of its authorized LOB; and Kansas City, Kansas, lost $4,078,906, or about 9% of its authorized LOB. Each reduction technically increased the district's local responsibility by those lost state aid amounts.

We acknowledge the panel made no specific findings about the actual effect, *e.g.*, reduction of student achievement, that the proration of such aid may have had on the plaintiff districts. But it found as a general result that districts either had to cut their budgets or raise their local mill levy to account for budget shortfalls. It relied on the testimony of Dale Dennis, who testified that some districts had actually cut their budgets due to the proration—rather than increase their mill levies.

Similar to capital outlay, the panel essentially found past, and ongoing, inequitable educational opportunity, as evidenced by its finding of past full payment of general supplemental state aid, the sudden and continual reduction of that aid for no cost-based reason, its repeated identification of the problem-solving aid as "equalization payments," and the cutting of district budgets or raising of mill levies to account for the resulting revenue shortfalls. See *Cason*, 211 Kan. at 412 ("[A] general finding of fact by the district court raises a presumption that it found all facts necessary to sustain and support the judgment rendered."). The panel's ack-

nowledgment of the vast disparities in assessed property values between the similarly sized Galena and Burlington school districts—and the consequences of the disparities—again bears this out.

Galena has one of the lowest assessed valuations per pupil in the state, so most of its LOB funding comes from supplemental general state aid. By contrast, Burlington has one of the highest assessed valuations per pupil in the State, and it receives no such supplemental aid. According to the record on appeal, in fiscal year 2012 Galena's adopted LOB was $1,500,000. With full supplemental general state aid, it was entitled to receive equalization payments of $1,241,550, leaving $258,450 to be provided by its local tax levies. But when its entitlement was prorated to 86.1%, it lost $172,576 in supplemental payments which, when added to the $258,450, increased its local responsibility to $431,026. To cover this shortfall, Galena needed to raise its local property taxes by about 12 mills, bringing its total local responsibility under the LOB to about 30 mills. Or it needed to cut its budget.

By contrast, per the testimony of Dale Dennis and exhibits in the record, that same year Burlington's adopted LOB was $2,117,246. While this was nearly twice as much as Galena's, Burlington's total local responsibility was only about 6 mills. And the legislature's decision to prorate supplemental general state aid had no impact on Burlington.

As the State points out, however, even if supplemental general state aid were fully funded, the wealthiest districts—including Burlington and the others above the 81.2 percentile of AVPP—would still be able to obtain greater amounts of funds with fewer mills than the districts with lower property wealth. While true, the State's proration of the equalizing payments has made it even more difficult for those districts with lower property wealth to obtain reasonably equal access to substantially similar educational opportunity through similar tax effort.

As with the withholding of capital outlay equalization payments, the panel found this proration of supplemental general state aid disproportionately impacted poorer districts while insulating the districts at the top of the wealth scale. Given our standard of review

which requires that we disregard any conflicting evidence or other inferences which might be drawn from the evidence, we find the panel's findings are supported by substantial competent evidence. See *Unruh,* 289 Kan. at 1195.

But just as the panel analyzed capital outlay, here it too may have applied a test of "zero tolerance" for any wealth-based disparity, *i.e.*, perhaps requiring the same standard, or higher, under equal protection law that we rejected in prior school finance decisions. Nevertheless, after applying our test we conclude that the level of wealth-based disparity inherent in the LOB equalizing mechanism became an unreasonably disparate level due to the proration of supplemental general state aid beginning i fiscal year 2010.

We reached a similar conclusion in *Montoy III*, 279 Kan. at 834. During the legislature's 2005 regular session, it raised the LOB cap from 25% to 27% for fiscal year 2006. But it failed to provide supplemental general state aid for the additional authorized 2%. See L. 2005, ch. 152, secs. 23(b)(9)(B), 24(b). As a result, we held this provision failed to remedy the unconstitutionality of the school funding formula. We observed that the increase in the LOB cap exacerbated wealth-based disparities among districts because any funds above the former 25% cap would have to come entirely from each district's property tax base. 279 Kan. at 834. Prorating all supplemental general state aid to which a district is entitled has the same basic effect as failing to provide equalization aid for a specified portion of a district's LOB.

After finding the proration was unconstitutional, the panel essentially enjoined any action that modified K.S.A. 2012 Supp. 72-6434 as it existed on July 1, 2012, or that resulted in an appropriation of "less than full funding of such statutory formula," through proration or otherwise.

As the panel suggested, the constitutional infirmity can be cured in a variety of ways—at the choice of the legislature. And as with the capital outlay statutes, the legislature should have an opportunity to promptly cure these LOB inequities. Any cure will be measured by determining whether it sufficiently reduces the unreasonable, wealth-based disparity so the disparity then becomes

constitutionally acceptable under our equity test, not whether the cure necessarily restores funding to the prior levels.

*The plaintiff districts have no entitlement to capital outlay equalization payments not made for fiscal year 2010.*

The plaintiffs sought an order from the panel requiring the State to make approximately $22 million of payments pursuant to K.S.A. 2009 Supp. 72-8814(b) to those school districts that had otherwise been entitled to capital outlay equalization aid in fiscal year 2010. After interpreting this claim as requesting an order of mandamus ordering distribution of the back payments, the panel denied it for a number of reasons.

We agree with the panel's denial based generally upon the Governor's proper allotment of the capital outlay equalization funds in November 2009. We therefore need not analyze the balance of the panel's alternative rationales. See *State v. Holt*, 298 Kan. 469, 481, 313 P.3d 826 (2013) (because dismissal of K.S.A. 60-1507 motion was proper due to its untimely filing, court need not address district court's additional holding that motion was successive).

*Standard of review*

This issue raises mixed questions of fact and law. So findings of fact are reviewed for substantial competent evidence and the conclusions of law based on those findings are subject to our unlimited review. See *Progressive Products*, 292 Kan. at 955.

*Discussion*

As discussed above, K.S.A. 72-8801 *et seq.* governs capital outlay funding, and K.S.A. 2013 Supp. 72-8814 specifically entitles certain school districts to receive what are commonly known as capital outlay equalization payments. When this lawsuit was filed, K.S.A. 2009 Supp. 72-8814(b) authorized the distribution of certain equalization aid from the State and provided in relevant part:

"In each school year, each school district which levies a tax pursuant to K.S.A. 72-8801 *et seq.*, and amendments thereto, shall be entitled to receive payment from the school district capital outlay state aid fund in an amount determined by the state board of education as provided in this subsection."

Subsection (c) in turn set forth the required steps for initiating the transfer of such monies from the State to the school district capital outlay state aid fund for later distribution to the school districts:

"The [Kansas State Board of Education] shall certify to the director of accounts and reports the entitlements of school districts determined under the provisions of subsection (b), and *an amount equal thereto shall be transferred by the director from the state general fund to the school district capital outlay state aid fund* for distribution to school districts. All transfers made in accordance with the provisions of this subsection shall be considered to be demand transfers from the state general fund." (Emphasis added.) K.S.A. 2009 Supp. 72-8814(c).

The school district capital outlay state aid fund consists of all amounts in the state treasury that are transferred to it from the state general fund under subsection (c). K.S.A. 2009 Supp. 72-8814(a).

The panel correctly found that for fiscal year 2010 the 2009 legislature's omnibus appropriations act per K.S.A. 2009 Supp. 75-6702 made a specific "no limit" appropriation for capital outlay equalization. L. 2009, ch. 124, sec. 66(b). While finding it was unclear if the legislature had intended an appropriation for capital outlay, the panel concluded that any money that may have been so appropriated had been eliminated by the Governor under his proper use of the allotment system in November 2009.

On appeal, the plaintiffs argue that the monies were not properly removed by allotment. Accordingly, they contend these monies are still available under the 2009 legislature's appropriations bill for distribution to the districts.

Before addressing their argument, some background on the allotment system is in order. Article 2, Section 24 of the Kansas Constitution provides that "[n]o money shall be drawn from the treasury except in pursuance of a specific appropriation made by law." But K.S.A. 75-3722 delegates authority to the executive branch to reduce appropriations made by the legislature in a given fiscal year through an allotment system. An allotment is defined by K.S.A. 75-3701(6) as "a limitation on the use of amounts available to state agencies under the allotment system with a period of from one (1) to twelve (12) months within a fiscal year."

The State can exercise an allotment in two situations, one of which is relevant here. Specifically, an allotment is required when the Secretary of Administration finds that the State's resources are likely to be insufficient to finance the legislature's appropriations for a given fiscal year, *i.e.*, to balance the State's budget. K.S.A. 75-3722; K.A.R. 1-61-1(a)(1). For such mandatory allotments, K.S.A. 75-3722 confers broad authority on the Secretary to implement an allotment plan. That statute specifically provides:

"Whenever for any fiscal year it appears that the resources of the general fund or any special revenue fund are likely to be insufficient to cover the appropriations made against such general fund or special revenue fund, *the secretary of administration*, on the advice of the director of the budget, *shall, in such manner as he or she may determine*, inaugurate the allotment system so as to *assure that expenditures for any particular fiscal year will not exceed the available resources of the general fund or any special revenue fund for that fiscal year.*" (Emphasis added.) K.S.A. 75-3722.

After the Secretary decides to implement a mandatory allotment system, the director of the budget must notify each affected state agency of the Secretary's decision. K.A.R. 1-61-1(b). Among other things, the notice must inform the agency that it has the right to seek review of the Secretary's allotment decision. K.A.R. 1-61-1(b)(3). A state agency may request that the Governor review an allotment decision within 10 days after either the date the notice was personally delivered to the agency or postmarked. K.A.R. 1-61-3. If the Governor does not alter the Secretary's decision, the allotment decision will stand. See K.S.A. 75-3722, *as modified by State, ex rel., v. Bennett*, 219 Kan. 285, 301, 547 P.2d 786 (1976) (devolving duties of the state finance council on the Governor, including the power to render a decision on an agency's appeal from an allotment decision); K.A.R. 1-61-3.

We next turn to the panel's findings regarding the Governor's allotment, which we find are supported by substantial competent evidence. According to the record on appeal, on July 2, 2009, after the 2009 legislative session, Duane Goossen, as Secretary of Administration and Director of the Budget, certified to Governor Parkinson that a mandatory allotment was required because there were likely to be insufficient resources in the state general fund to

cover all of the appropriations made against it during the 2009 legislative session. In July 2009, Governor Parkinson announced a plan to balance the budget, which called for an allotment reducing the state general fund by approximately $90 million. The allotment plan included a 2% reduction, *i.e.*, approximately $39 million, in the Department of Education's general state aid account—the fund from which the BSAPP is distributed. In November 2009, Governor Parkinson announced a second allotment of $150 million from the state general fund, which eliminated an additional $10.5 million from the general state aid account.

On December 23, 2009, Secretary Goossen sent the director of accounts and reports a spreadsheet detailing the November allotment, which showed that the general state aid account had been additionally reduced by that $10.5 million. A footnote accompanying that spreadsheet entry read: "Amount allotted from General State Aid is reduced $25,600,000 *to reflect savings from not making the Capital Outlay State Aid Transfer.*" (Emphasis added.) The plaintiffs argue that this notice is "the only place that the Governor's allotment addresses the capital outlay equalization funds" and that it was insufficient to remove those funds. We disagree.

As for the panel's specific finding of confusion about the legislature's intent, the plain language of the 2009 appropriations bill clearly authorizes a "no limit" appropriation, *i.e.*, to fund the capital outlay state aid. But according to Goossen's deposition testimony, the legislature intended to use the funds normally set aside for capital outlay equalization for general state aid instead. He testified this intent was not reflected in the appropriations bill due to inaccurate drafting.

Goossen further testified in his deposition that after the passage of the appropriations bill he had conversations with senators, as well as staff from the Governor's office, the Division of the Budget, and the Legislative Research Department to try to confirm the legislature's intent. There was also discussion among Budget staff about ways to stop the capital outlay transfer for fiscal year 2010 which began July 1, 2009. One email from the budget analyst assigned to the Department of Education stresses the importance of preventing the transfer to the capital outlay state aid fund from

occurring in order to prevent the general state aid fund from being short $25.6 million—the same amount referenced in the spreadsheet's footnote challenged by plaintiffs.

Another email from an exchange between the same budget analyst and one in the Legislative Research Department relates that, following the 2009 legislative session, the Legislative Research Department, the Division of the Budget, and the Department of Education "all were in agreement that Capital Outlay Aid was not funded in [fiscal year] 2010 and that we would have to work it out during the budget process to align the budget with this policy." Consistent with this record evidence, Goossen testified that the allotment process was used to stop the transfer of funds from the state general fund to the capital outlay state aid fund and to clear up any confusion regarding the legislature's intent.

We also agree with the panel's conclusion based on its findings that the allotment process was effectively utilized to reallocate the funds appropriated for capital outlay to the general state aid account. We especially observe that per statute Goossen provided notification of the allotment to the Division of Accounts and Reports—the entity responsible for adjusting the account balances in the State's accounting system. See K.S.A. 75-3725 ("The director of the budget . . . shall make available to the director of accounts and reports all information as to allotment plans and available funds as will assist the director of accounts and reports in recording . . . the amounts allotted and available for expenditure . . . ."). We further note, as the panel correctly found based on the evidence, that the State Board of Education did not provide the required certification of payment entitlements under K.S.A. 2009 Supp. 72-8814(c) during fiscal year 2010. This failure is indicative of the Board's understanding that the November allotment had effectively mooted any fund transfers for fiscal year 2010 that would otherwise have been based upon the Board's certified entitlements.

The plaintiffs alternatively argue that even if the appropriated funds were removed by allotment, their removal was improper because an allotment cannot be exercised against a "demand transfer." They rely on Attorney General Opinion No. 82-160 which expresses this sentiment. And per K.S.A. 2009 Supp. 72-8814(c),

"[a]ll transfers made in accordance with the provisions of this subsection shall be considered to be demand transfers from the state general fund." But as the State correctly points out, the 2009 legislature deemed all transfers made pursuant to subsection (c) for fiscal years 2010 and 2011 to be "revenue transfers." See L. 2009, ch. 124, sec. 130(b) ("[N]otwithstanding the provisions of K.S.A. 2008 Supp. 72-8814 . . . all transfers made from the state general fund to the school district capital outlay state aid fund in accordance with the provisions of K.S.A. 2008 Supp. 72-8814 . . . shall be considered to be revenue transfers from the state general fund.").

Moreover, the panel held that the Governor's allotment was exercised against the legislature's appropriation of the funds, not their transfer. More specifically, it found that Article 2, Section 24's requirement—"No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law"—when combined with the fact the legislature had actually made a "no limit" appropriation for capital outlay state aid for fiscal year 2010, meant that the allotment was exercised instead against that appropriation. And following this finding to its logical conclusion, the panel held that the allotment against the appropriation effectively mooted the necessity of a funds transfer from the state general fund to the school district capital outlay fund for distribution to school districts. See K.S.A. 2009 Supp. 72-8814(c).

Finally, plaintiffs argue that pursuant to K.S.A. 2009 Supp. 72-64b02 they presented a notice of claims dated June 17, 2010—13 days before the end of fiscal year 2010—demanding that the State Board certify the entitlements for that fiscal year. The State Board finally did so on September 22, 2010, almost 3 months after the end of that fiscal year, and approximately 10 months after the allotment. The plaintiffs argue that one or both of these actions were sufficient to "encumber" the capital outlay funds for fiscal year 2010, making them yet available for distribution.

But the money in the state general fund designated for capital outlay was reallocated to the Department of Education's general state aid fund in November 2009. And the record does not reveal that any entity asked for the allotments to be reviewed per K.A.R. 1-61-3. So by June 17, 2010, there were no funds appropriated by

the 2009 legislature available to be transferred under K.S.A. 2009 Supp. 72-8814(c) to the capital outlay fund for distribution to the school districts. K.S.A. 2009 Supp. 72-8814(a) provides: "The [school district capital outlay state aid] fund shall consist of all amounts *transferred* thereto under the provisions of subsection (c)." (Emphasis added.) Without transfer, there was no money to be encumbered.

Because we agree with the panel, we reject plaintiffs' claim for an order to make the State pay the 2010 capital outlay equalization payment of approximately $22 million.

MISCELLANEOUS

*The plaintiffs are not entitled to attorney fees.*

The panel denied the plaintiffs' request for attorney fees without explanation. On appeal, the plaintiffs argue that they are entitled to attorney fees under two theories. First, we should exercise our equitable powers and order attorney fees for their class action claim for capital outlay payments not made. Second, we should award fees under our inherent power to sanction bad-faith conduct.

The State denies the plaintiffs are entitled to attorney fees under either theory. We agree with the State.

*Standard of review*

Whether a court may award attorney fees is a question of law subject to unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1200, 221 P.3d 1130 (2009).

*Discussion*

Generally, a Kansas court may not award attorney fees absent statutory authorization or party agreement. *Snider v. American Family Mut. Ins. Co.*, 297 Kan. 157, 162, 298 P.3d 1120 (2013); *Unruh*, 289 Kan. at 1200. The plaintiffs do not allege those conditions are met. But they argue two exceptions to the general rule.

Their asserted common recovery fund exception does not apply, however, because the plaintiffs have not prevailed on their class action claim for unpaid capital outlay equalization payments. So there is no common recovery fund from which attorney fees may be drawn. See *Gigot v. Cities Services Oil Co.*, 241 Kan. 304, 313,

737 P.2d 18 (1987) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 62 L. Ed. 2d 676 [1980]) (" '[A] lawyer who *recovers* a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.' " [Emphasis added.]).

And while this court has the inherent power to impose sanctions—including attorney fees—for bad-faith conduct, we have never done so absent some statutory authority. See, *e.g.*, *Schoenholz v. Hinzman*, 295 Kan. 786, 801-03, 289 P.3d 1155 (2012) (attorney fees awarded as sanction pursuant to K.S.A. 2008 Supp. 60-237[b][2][E]); *Unruh*, 289 Kan. at 1201 (attorney fees awarded pursuant to K.S.A. 2008 Supp. 45-222[c]). In support of the plaintiffs' fee claim, they merely argue that the State has repeatedly failed to comply with its constitutional duty to fund education and will continue to do so unless sanctions are imposed. It cites the State's failure to consider the actual costs of funding education or to order an updated cost study as evidence of bad faith. But since we have determined that neither one is absolutely required for the legislature to discharge its constitutional duty under Article 6, we cannot hold that the State acted in bad faith. Accordingly, we decline to exercise our inherent power to award attorney fees.

The panel's denial of the plaintiffs' attorney fee request is affirmed.

## The separation of powers

The State argues that the remedies ordered by the panel are beyond judicial authority as a matter of law. Included among the State's arguments are contentions that the panel's order violates the separation of powers in a number of ways. The plaintiffs respond, in part, by contending the panel should have gone further, *e.g.*, ordering that BSAPP be set higher.

### Standard of review

When considering if there has been a violation of the separation of powers doctrine, a court must examine the specific facts and circumstances presented and search for a usurpation by one branch of government of the powers of another branch of government.

See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 888, 179 P.3d 366 (2008).

*Discussion*

We generally addressed the separation of powers issue in our discussion about justiciability. See, *e.g., Harris v. Shanahan*, 192 Kan. 183, 387 P.2d 771 (1963). Because we are reversing and remanding, which may eventually make the remedy issues moot, we reach no decision on any particular arguments in the remedy context. We do observe, however, that if on remand the panel eventually proceeds to remedies, it should not be dismissive of some of the State's contentions. They should be carefully considered.

## CONCLUSION

In conclusion, the holdings of the hardworking panel are affirmed in part and reversed in part.

We affirm the panel's dismissal of all of the individual plaintiffs' claims and the plaintiff school districts' equal protection and due process claims for lack of standing.

We further affirm the panel's implicit ruling that the plaintiff school districts' claims under Article 6 of the Kansas Constitution are justiciable because they are not political questions.

We further affirm the panel's denial of plaintiffs' claims for payment of capital outlay state aid to which districts were otherwise entitled for fiscal year 2010.

We additionally affirm the panel's denial of plaintiffs' claims for attorney fees.

We further affirm the panel's rulings that the State failed to meet its duty to provide equity in public education as required under Article 6 of the Kansas Constitution. More specifically, we affirm the panel's holding that the State established unreasonable, wealth-based disparities by (1) withholding all capital outlay state aid payments to which certain school districts were otherwise entitled under K.S.A. 2012 Supp. 72-8814(c) and (2) prorating all supplemental general state aid payments to which certain districts were entitled under K.S.A. 2012 Supp. 72-6434 for their local option budgets.

We remand for the panel to enforce these affirmed equity rulings. Because the legislature should have an opportunity to expeditiously address these inequities, its actions may require additional panel review. So we provide the following guidance to the panel:

1. As to capital outlay:
    a. If by July 1, 2014, the legislature fully funds the capital outlay provision as contemplated in K.S.A. 2013 Supp. 72-8814, the panel need not take any additional action on this issue.
    b. If by July 1, 2014, the legislature acts to cure—whether by statutory amendment, less than full restoration of funding to prior levels, or otherwise—the panel must apply our test to determine whether that legislative action cures the inequities it found and which we have affirmed. More specifically, the panel must assess whether the capital outlay state aid—through structure and implementation—then gives school districts reasonably equal access to substantially similar educational opportunity through similar tax effort. If the legislative cure fails this test, the panel should enjoin its operation and enter such orders as the panel deems appropriate.
    c. If by July 1, 2014, the legislature takes no curative action, the panel shall declare null and void that portion of K.S.A. 2013 Supp. 72-8814(c) prohibiting transfers from the state general fund to the school district capital outlay state aid fund. This will enable the funds envisioned by the statutory scheme to be available to school districts as intended.
    d. Ultimately, the panel must ensure the inequities in the present operation of the capital outlay statutes, K.S.A. 72-8801 *et seq.*, are cured.
2. As to the local option budget and supplemental general state aid:
    a. If by July 1, 2014, the legislature fully funds the supplemental general state aid provision as contemplated in the existing SDFQPA, K.S.A. 72-6405 *et seq.*, without pro-

ration, the panel need not take any additional action on this issue.

b. If by July 1, 2014, the legislature acts to cure—whether by statutory amendment, less than full restoration of funding to prior levels, or otherwise—the panel must apply our test to determine whether such action cures the inequities it found and which findings we have affirmed. If the panel then determines those inequities are not cured, it should enjoin operation of the local option budget funding mechanism, K.S.A. 2013 Supp. 72-6433 and 72-6434, or enter such other orders as it deems appropriate.

c. If by July 1, 2014, the legislature takes no curative action, the panel should enjoin operation of the local option budget funding mechanism, K.S.A. 2013 Supp. 72-6433 and 72-6434, or enter such other orders as it deems appropriate.

d. Ultimately, the panel must ensure the inequities in the present operation of the local option budget and supplemental general state aid statutes are cured.

We also remand to the panel to determine whether the State met its duty to provide adequacy in public education as required under Article 6 of the Kansas Constitution. Although adequacy and equity are distinct components of Article 6, they do not exist in isolation from each other. So curing of the equity infirmities may influence the panel's assessment of the adequacy of the overall education funding system.

The panel shall promptly make findings as appropriate, consider whatever evidence it deems relevant—whether presently in the record or after reopening—and apply the adequacy test articulated in this opinion. More specifically, the panel must assess whether the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose v. Council for Better*

*Educ., Inc.,* 790 S.W.2d 186 (Ky. 1989), and as presently codified in K.S.A. 2013 Supp. 72-1127.

On remand, the panel shall proceed consistent with the further direction provided in this opinion.

BEIER, J., not participating.

DAVID L. STUTZMAN, District Judge, assigned.